28 P.3d 753 (2001)
144 Wash.2d 386
STATE of Washington, Respondent,
v.
Ronald J. HORRACE, Petitioner.
No. 69613-6.
Supreme Court of Washington, En Banc.
Argued January 30, 2001.
Decided August 2, 2001.
*754 Thomas Edward Doyle, Hansville, for Petitioner.
Jeremy Randolph, Lewis County Prosecutor, J. Andrew Toynbee, Deputy, Chehalis, for Respondent.
OWENS, J.
In this case we must decide whether a trooper's pat-down search of a vehicle passenger, following the arrest of the vehicle's driver, was constitutionally sound. The trooper's limited, protective search led to petitioner Ronald J. Horrace's arrest for possession *755 of a concealed weapon. Pursuant to the heightened search incident to that arrest, Horrace was charged with possession of methamphetamine while armed. The trial court denied Horrace's motion to suppress. The Court of Appeals affirmed, concluding that the initial protective search had been based on specific, articulable facts supporting an objectively reasonable belief that Horrace was armed and dangerous. We agree and therefore affirm the Court of Appeals.

FACTS
On May 26, 1997, at around 1:15 a.m., a Washington State trooper monitoring traffic on I 5 in Lewis County observed a northbound vehicle that appeared to be exceeding the posted speed limit of 70 m.p.h. After receiving a radar reading of 78 m.p.h., the trooper pulled the vehicle over, stopping about one car-length behind it and illuminating its interior with the spotlight on his patrol car. The streetlights for the off ramp in the distance were too far away to be of any benefit. Defendant Ronald Horrace, the only passenger, was seated in the right front passenger seat. The trooper approached on the passenger side of the vehicle, away from the traffic, and asked the driver for identification. The driver produced a Washington driver's license that had a hole punched in it, indicating that he had been stopped before and was driving on a suspended license, a circumstance he admitted. Thinking Horrace could drive the vehicle away and eliminate the need to impound it, the trooper asked Horrace if he had a valid driver's license. As Horrace took out his license, the trooper could see inside Horrace's oversized wallet.
From the radio check, the trooper learned that Horrace's license was valid, that the driver was driving with a suspended license, and that there were several outstanding warrants for the driver's arrest. While waiting for the results of the radio check, the trooper observed the driver leaning to his right, tipping his right shoulder down, as though he were "doing something down between the seats." Report of Proceedings (RP) (Aug. 8, 1997) at 12. The driver's "movements toward the center console of the vehicle and in [Horrace's] direction" concerned the trooper. Clerk's Papers (CP) at 29. The trooper believed that the driver "could have been retrieving a weapon for when [he] went back up there or concealing a weapon." RP (Aug. 8, 1997) at 12. Returning to the vehicle and placing the driver under arrest, the trooper asked him "what all the movement was up there," and the driver responded, "My butt itches, I was scratching it." Id. at 13.
After placing the driver in his patrol car, the trooper returned to the passenger side of the vehicle, asked Horrace to step out, and told him he "was going to pat him down for weapons." Id. at 14. Although the driver's movements had initially caused the trooper more concern, he had also been concerned about the passenger. The trooper wanted to do the pat-down search because of the driver's movements, which had raised the possibility of a concealed weapon, and because of Horrace's "close proximity to the console area where the gestures were being made." Id. at 29. The trooper observed that it would have been "easy to conceal something behind or inside" Horrace's heavy leather jacket with its numerous pockets. Id. at 14.
Prior to the pat-down search, the trooper asked Horrace if he had any guns, knives, or needles on his person, and Horrace said he did not. The trooper "felt a large bulge in [Horrace's] left breast pocket area of the jacket." Id. at 15. When asked about it, Horrace identified it as "some stuff." Id. From the pocket, the trooper removed two walnut shells, a piece of cloth, and a small, leather, zippered container that the trooper described as cylindrical and "very heavy and hard feeling." Id. at 16. The trooper unzipped the container and found a number of bullets. The trooper asked Horrace several times whether he was carrying a gun, and Horrace repeatedly said he was not. Continuing the pat-down search, the trooper found a loaded pistol magazine in Horrace's lower-left jacket pocket. When the trooper asked where the gun was, Horrace said it was under the seat. The trooper stepped forward and looked under the passenger seat, where he saw the gun lying on the floor. The trooper asked Horrace if he had a concealed weapons permit, and Horrace said he *756 did not. Without retrieving the gun, the trooper continued his pat-down search. Horrace told the trooper that he had a knife, and the trooper removed a switchblade from the right front pocket of Horrace's pants. The trooper arrested and handcuffed Horrace.[1] Continuing the search, the trooper found in Horrace's pants pocket a small pipe that smelled of marijuana. The trooper then opened Horrace's wallet without removing it from the chain attaching it to a belt loop. Inside the wallet was a small plastic bag containing a tan-colored powder later identified as methamphetamine. Because the trooper had not seen the plastic bag in Horrace's wallet earlier when Horrace had produced his driver's license, the trooper asked him where the bag had come from, and Horrace answered, "`Mike gave it to me, he figured he was going to jail.'" CP at 30.
Pursuant to former RCW 69.50.401(d) (1997), 9.94A.310 (1997), and 9.94A.370 (1996), Horrace was charged with possession of methamphetamine while armed with a firearm. A second count, unlawful possession of a firearm in the second degree, was dismissed prior to trial. The trial court denied Horrace's pretrial motion to suppress evidence of the methamphetamine seized pursuant to the warrantless search. At trial, Horrace testified that, while the trooper was running the radio check, the driver was "moving around digging" between the seats for "[m]ore than a minute" and had been "trying to hide stuff." RP (Aug. 20, 1997) at 87, 88, 92. Horrace maintained that the driver had slipped the methamphetamine into his wallet as it lay open in his lap. The jury returned a verdict of guilty as charged and found that Horrace was armed with a firearm at the time of the commission of the crime. Horrace's sentence was within the standard range and included the firearm enhancement.
Horrace appealed, contending that the trial court had erred in denying his motion to suppress. The Court of Appeals affirmed. We granted Horrace's petition for review and remanded the case to the Court of Appeals for reconsideration in light of State v. Parker, 139 Wash.2d 486, 987 P.2d 73 (1999). The Court of Appeals concluded that its prior opinion was consistent with Parker and should remain the same. This court granted Horrace's subsequent petition for review.

ISSUE
Did the trooper base his pat-down search of Horrace, a vehicle passenger, on specific, articulable facts supporting an objectively reasonable belief that Horrace was armed and dangerous?

ANALYSIS
Because Horrace did not assign error to any of the trial court's findings of fact, those findings are verities on appeal. State v. Stenson, 132 Wash.2d 668, 697, 940 P.2d 1239 (1997); State v. Hill, 123 Wash.2d 641, 644, 647, 870 P.2d 313 (1994). This court reviews de novo Horrace's challenges to the trial court's conclusions of law. State v. Johnson, 128 Wash.2d 431, 443, 909 P.2d 293 (1996). Horrace assigned error to the trial court's conclusion that the trooper "was justified in patting the defendant down for weapons for officer safety purposes." CP at 31-32. Horrace claims that the pat-down search for weapons violated his rights under the Fourth Amendment of the United States Constitution and article I, section 7, of the Washington State Constitution.
In two relatively recent cases, we examined the privacy rights of vehicle passengers in light of the broad protection afforded under article I, section 7. See Parker, 139 Wash.2d 486, 987 P.2d 73; State v. Mendez, 137 Wash.2d 208, 970 P.2d 722 (1999). *757 Article I, section 7, provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law."[2] Each of the three consolidated cases in Parker involved the warrantless search of a passenger's belongings in the course of a search incident to the lawful arrest of the vehicle driver. The lead opinion in Parker, when viewed with the concurrences, held that "the arrest of one or more vehicle occupants does not, without more, provide the `authority of law' under article I, section 7 of our state constitution to search other, nonarrested vehicle passengers, including personal belongings clearly associated with such nonarrested individuals." 139 Wash.2d at 502-03, 987 P.2d 73 (emphasis added). The court recognized that "under certain circumstances nonarrested individuals may pose a threat to officer safety in an arrest situation." Id. at 501, 987 P.2d 73; see also State v. Kennedy, 107 Wash.2d 1, 11, 726 P.2d 445 (1986) (noting that "[a]n officer conducting an investigative stop may be endangered not only by the suspect but by companions of the suspect as well"). Such circumstances, however, "can be addressed under Mendez or pursuant to Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)." Parker, 139 Wash.2d at 517, 987 P.2d 73 (Talmadge, J., concurring).
In Mendez, we held that a police officer may, incident to stopping a car for a traffic violation, "take whatever steps necessary to control the scene, including ordering the driver to stay in the vehicle or exit it, as circumstances warrant," but that, "with regard to passengers, ... [a]n officer must ... be able to articulate an objective rationale predicated specifically on safety concerns... for ordering a passenger to stay in the vehicle or to exit the vehicle to satisfy article I, section 7." Mendez, 137 Wash.2d at 220, 970 P.2d 722 (emphasis added). Whether such an articulable, objective rationale exists depends upon the circumstances at the scene of the traffic stop. Id. at 221, 970 P.2d 722. In deciding whether to direct a nonsuspected, nonarrested passenger into or out of a vehicle, an officer may consider a number of nonexclusive factors, none of which would, in isolation, necessarily satisfy the objective rationale standard.[3] The lead opinion in Parker noted that the arrest of another vehicle occupant supplied a significant factor: "[A] vehicle stop and arrest in and of itself provides officers an objective basis to ensure their safety by `controlling the scene,' including ordering passengers in or out of the vehicle as necessary." Parker, 139 Wash.2d at 502, 987 P.2d 73 (emphasis added) (citing Mendez, 137 Wash.2d at 220-21, 970 P.2d 722). We acknowledged in Mendez that, where "the purpose of the officer's interaction with the passenger is investigatory," the officer must meet the higher Terry standard. Mendez, 137 Wash.2d at 220, 223, 970 P.2d 722.
Turning to the present case, we note at the outset that, while the trooper may have had constitutionally sound authority under Parker and Mendez to ask Horrace to step out of the car, he did not ask Horrace to exit simply as a means of "`controlling the scene.'" Parker, 139 Wash.2d at 502, 987 P.2d 73 (quoting Mendez, 137 Wash.2d at 220, 970 P.2d 722). Rather, the trooper testified that, based on his observations as he ran the radio check, he believed that Horrace posed an independent threat to his safety. The trooper's interaction with Horrace was thus investigatory and, as such, was subject to the stop-and-frisk standards set forth in Terry and embraced in Washington case law as a test consistent with the constitutional guarantee of article I, section 7. See, e.g., State v. Broadnax, 98 Wash.2d 289, 296, 654 P.2d 96 (1982); State v. White, 97 Wash.2d 92, 105-06, 108, 640 P.2d 1061 (1982); Kennedy, 107 *758 Wash.2d at 4, 10, 726 P.2d 445; Mendez, 137 Wash.2d at 223, 970 P.2d 722.
Under Terry, to justify the intrusion of a limited pat-down search, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21, 88 S.Ct. 1868. The Terry court held that "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous ..., he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." Id. at 30, 88 S.Ct. 1868. Faced with a defendant's challenge to the permissibility of the protective search, the trial judge "must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances" and must apply "an objective standard"the belief of "`a man of reasonable caution.'" Id. at 21, 22, 88 S.Ct. 1868 (quoting Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)).
We hold steadfastly to the constitutional safeguards we have previously identified in the area of passenger privacy and emphasize here that the issue before us requires no more or no less than a thoughtful application of those well-established Terry principles set forth above. Plainly, the searches we examined in the consolidated Parker cases differ sharply from the search at issue in the present case. The officers in the Parker cases searched the passengers' belongings as part of the full-blown search incident to the lawful, custodial arrest of the vehicles' drivers; in effect, the officers treated the passengers' belongings as unlocked containers in the passenger compartment, subject to search under State v. Stroud, 106 Wash.2d 144, 720 P.2d 436 (1986). The officers' asserted predicate for the Parker searches was the arrest of the vehicles' drivers, and the alleged twofold purpose of those searches was to preserve evidence and ensure officer safety. In contrast, the asserted predicate for the trooper's search of Horrace was not the driver's arrest, nor did the trooper's alleged purpose extend beyond ensuring his self-protection. In fact, the lead opinion in Parker made clear the distinction between these two types of searches, recognizing that no officer may search a nonarrested passenger (or items clearly associated with such passenger) unless the officer can provide the "more" set forth in the Terry standard-the "objective suspicions that the person searched may be armed or dangerous." Parker, 139 Wash.2d at 502, 987 P.2d 73.
The question we must now decide is whether the trooper's pat-down search of Horrace was supported by the articulable, objective facts (and reasonable inferences therefrom) required under Terry. The trooper testified that three particular observations gave rise to his belief that Horrace was armed and presently dangerous: the driver was making unexplained movements between the seats and in Horrace's direction, Horrace was in close proximity to those movements, and Horrace was wearing a bulky, zippered jacket. The trooper observed the driver leaning to his right, dropping his right shoulder down, and "doing something" in the console area between the bucket seats and "in [Horrace's] direction." RP (Aug. 8, 1997) at 12; CP at 29. From the trooper's perspective, the driver's movements were consistent with an attempt to conceal something, possibly a weapon. Although the trooper saw no movement from Horrace, the driver's movements had drawn his attention to Horrace and raised the concern that the driver had concealed a weapon inside or behind Horrace's jacket.
We cannot conclude that the trooper's objective, undisputed facts were insufficient or that his inferences were irrational. In Kennedy, we determined that, after a driver (Kennedy) was signaled to pull over, his movement in "lean[ing] forward as if to put something under the seat" was "sufficient to give [the officer] an objective suspicion that Kennedy was secreting something under the front seat of the car," and we noted that the officer "had no way of knowing what Kennedy was hiding." Kennedy, 107 Wash.2d at 3, *759 11, 726 P.2d 445. We observed that the officer "could have" frisked Kennedy (who was not under arrest but only under investigation) "had he suspected Kennedy might be armed." Id. at 11, 726 P.2d 445. However, because the officer inferred from Kennedy's movement that a weapon had possibly been concealed under Kennedy's seat, the officer permissibly directed his limited, protective search to that area.
Having agreed in Kennedy that the driver's forward lean was sufficient to arouse the officer's suspicion that a weapon had been concealed, we recognize in the present case that the more extensive movements of the driver could have caused the trooper to suspect concealment of a weapon. And just as the officer in Kennedy reasonably directed his weapons search to the place where the driver had reached (that is, beneath the driver's seat), the trooper in the present case concluded that, given the driver's pronounced movements in Horrace's direction, the driver could have concealed a weapon in or behind Horrace's jacket. Indeed, when the trooper asked the driver about the movements, the trooper received a flippant, obviously evasive answer that did nothing to allay his fears. To satisfy Terry, an "`officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" State v. Belieu, 112 Wash.2d 587, 602, 773 P.2d 46 (1989) (emphasis omitted) (quoting Terry, 392 U.S. at 27, 88 S.Ct. 1868). In light of the analysis in Kennedy, we conclude that in the present case the trooper's protective pat-down search of Horrace was based, as Terry requires, on specific, objective facts and the rational inferences drawn from those facts.
Challenging none of the facts that the trooper relied on, Horrace asserts that, because the trooper discerned no movement on Horrace's part, Horrace could not have been subjected to a Terry frisk. This argument rests on the assumption that the driver could not have passed a weapon to Horrace or concealed one in Horrace's jacket without causing Horrace to make some movement observable to the trooper. We cannot agree with Horrace that his apparent motionlessness in the face of the driver's movements in his direction immunized him from suspicion. As evident from the circumstances in Terry, officers in the field must routinely look at the potentially criminal roles of individuals in context, not in isolation. See, e.g., Terry, 392 U.S. at 5-7, 30, 88 S.Ct. 1868 (stop-and-frisk predicated on officer's observations of three men casing store); Belieu, 112 Wash.2d at 588-92, 773 P.2d 46 (investigative stop based on observations of interrelated actions of two men on foot and two passengers); State v. Laskowski, 88 Wash.App. 858, 950 P.2d 950 (1997) (pat-down of juvenile's backpack justified by suspicious group activity, despite juvenile's nervousness being sole individualized observation), review denied, 135 Wash.2d 1002, 959 P.2d 127 (1998). Horrace admitted at trial that he was "looking off this way," "looking out the car window," as the driver "was moving around ... trying to hide stuff." RP (Aug. 20, 1997) at 92, 98. The trooper could not reasonably have been expected to risk his personal safety on his power to divine whether Horrace was innocently, coincidentally looking the other way or was simply feigning detachment as the driver concealed a weapon on him. We thus find more reasonable the trooper's assumption that the transfer of a weapon could have occurred without any detectable movement by Horrace.[4]
Consistent with Horrace's argument that the absence of any noticeable movement on his part shielded him from suspicion, he maintains that he was searched simply because he was present in the vehicle of an arrested driver. Clearly, just as a person's "`mere presence' at a private residence being searched pursuant to a search warrant cannot justify a frisk of [that] person," passengers *760 in a vehicle to be searched incident to the driver's arrest cannot automatically be subjected to a pat-down for weapons. Broadnax, 98 Wash.2d at 295, 654 P.2d 96. The Terry standard must be met, and that standard requires that the well-founded suspicion be directed at the particular individual to be searched. Here, specific facts cast suspicion on Horrace. It was undisputed that the driver's movements were made in Horrace's direction and that Horrace was in close proximity to the suspicious movements. Additionally, the trooper testified that he was concerned that the driver had concealed a weapon in Horrace's jacket. These facts negate Horrace's claim that the trooper's pat-down search was part of a general, routine (and plainly impermissible) practice of patting down passengers after the driver's arrest. See, e.g., State v. Smith, 102 Wash.2d 449, 452-53, 688 P.2d 146 (1984) (holding that a "generalized suspicion" of those questioned in high-crime area was insufficient to justify Terry frisk).
Finally, because Terry provides that the trial court "must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances," both the trial court and the Court of Appeals cited the time of day as a factor contributing to the reasonableness of the trooper's protective search. Terry, 392 U.S. at 21, 88 S.Ct. 1868. As to the timing of a Terry stop-and-frisk, we have previously stated that, while the timing may not always be of significance, it is significant when a stop occurs in the early morning darkness. State v. Collins, 121 Wash.2d 168, 176, 847 P.2d 919 (1993); see also Mendez, 137 Wash.2d at 219 n. 4, 970 P.2d 722 (observing that, particularly where officers are outnumbered, a nighttime stop in an isolated location could be "more menacing" than a downtown daytime stop). Not only does "[t]he darkness ma[k]e it more difficult for [the officer] to get a clear view into the car," but "an individual who has been stopped may be more willing to commit violence against a police officer at a time when few people are likely to be present to witness it." Collins, 121 Wash.2d at 174-75, 847 P.2d 919. Because the special dangers posed by an early morning stop "are proper considerations for a reasonably careful police officer," the trial court and Court of Appeals in the present case appropriately regarded the time of day as an additional factor supporting the reasonableness of the trooper's decision. Id. at 175, 847 P.2d 919.

CONCLUSION
Citizens of this state do not expect to surrender their article I, section 7, privacy guaranty when they step into an automobile with others, for as E.B. White put it, "Everything in life is somewhere else, and you get there in a car."[5] Any intrusion upon the constitutionally protected privacy interest of vehicle passengers must meet the requirements we have previously set forth. Only where a police officer is able to articulate an objective rationale based specifically on officer safety concerns, may the officer, as a means of controlling the scene, direct passengers to remain in or exit a vehicle stopped for a traffic infraction. See Mendez, 137 Wash.2d at 220-21, 970 P.2d 722. Where an officer's purpose is to investigate a passenger, the higher Terry standard must be met. Id. at 220, 970 P.2d 722. The frisk of a vehicle passenger will be justifiable only where the officer is able to point to specific, articulable facts giving rise to an objectively reasonable belief that the passenger could be armed and dangerous. Where the suspicion that an individual may be armed is based in part on the observable actions of others in a particular context, the officer must point to specific, articulable facts tying those observable movements and their circumstances directly and immediately to the individual to be frisked. In those cases where the Terry requirements are met, it necessarily becomes "unreasonable to limit an officer's ability to assure his own safety." Kennedy, 107 Wash.2d at 12, 726 P.2d 445.
In the present case, the trial court and the Court of Appeals concluded that the limited, protective search of Horrace was justified under Terry. We agree. We are not prepared to hold, as Horrace has requested, that as a matter of law the troopers factual observations *761 and rational inferences were inadequate to satisfy the Terry standard. Here, the trooper pointed to the drivers extended, undisputed, and unexplained movements, and he tied those movements directly and immediately to Horrace by observing that the driver had leaned in Horraces direction, that Horrace was in close proximity to the drivers movements, and that Horrace was wearing a bulky, zippered jacket in which the driver could have been concealing a weapon. In light of those facts, the time of day, and the relative isolation of the scene, we hold that the troopers pat-down search of Horrace satisfied the Terry standard and therefore did not offend article I, section 7, of our state constitution. We affirm the Court of Appeals.
SMITH, MADSEN, IRELAND, BRIDGE, and CHAMBERS, JJ., concur.
SANDERS, J. (dissenting)
Our constitution's bright line against warrantless search and seizure is considerably dimmed by the majority opinion. Washington Constitution article I, section 7, provides:
INVASION OF PRIVATE AFFAIRS OR HOME PROHIBITED. No person shall be disturbed in his private affairs, or his home invaded, without authority of law.
The "authority of law" referenced in the text is a warrant. State v. Ladson, 138 Wash.2d 343, 350, 979 P.2d 833 (1999); City of Seattle v. Mesiani, 110 Wash.2d 454, 457, 755 P.2d 775 (1988). Although nowhere to be found in the text, this court has previously engrafted several exceptions to the warrant requirement: consent, exigent circumstances, searches incident to a valid arrest, inventory searches, plain view, and Terry[1] investigative stops. Ladson, 138 Wash.2d at 349, 979 P.2d 833; State v. Hendrickson, 129 Wash.2d 61, 71, 917 P.2d 563 (1996).
Since the search of passenger Ronald Horrace was accomplished without benefit of warrant, we begin our analysis with the proposition that it was unreasonable per se. State v. Parker, 139 Wash.2d 486, 496, 987 P.2d 73 (1999) (citing authorities). As held in Parker:
This is a strict rule. [State v.] White, 135 Wash.2d [761,] 769[, 958 P.2d 982 (1998) ]. Exceptions to the warrant requirement are limited and narrowly drawn. White, 135 Wash.2d at 769, 958 P.2d 982; Hendrickson, 129 Wash.2d at 70-71, 917 P.2d 563. The State, therefore, bears a heavy burden to prove the warrantless searches at issue fall within the exception it argues for.
Parker, 139 Wash.2d at 496, 987 P.2d 73.
Here the state, and the majority, argue the warrantless search of passenger Horrace falls within the narrow confines of Terry. Under Terry an individual may be frisked for weapons where the investigating officer "has reasonable grounds to believe the person to be armed and presently dangerous." State v. Broadnax, 98 Wash.2d 289, 294, 654 P.2d 96 (1982). The narrow scope of this "stop-and-frisk" exception was emphasized in Terry's companion case, Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). Suppressing evidence obtained in the course of a stop-and-frisk, the Court stated that before an officer places a hand on the person of a citizen to search for anything,
he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous.

Sibron, 392 U.S. at 64, 88 S.Ct. 1889, quoted in Broadnax, 98 Wash.2d at 294, 654 P.2d 96.
The majority opinion appears to recognize and articulate the rule as expressed in Terry, Sibron, Parker, and Broadnax, but defeats it through improper application to these circumstances. To test the majority's result we must ask: To what particular facts can the officer point to justify a reasonable inference that passenger Horrace was "armed and dangerous"?
The majority identifies two:
(1) "[t]he driver's `movements toward the center console of the vehicle and in [Horrace's] direction'" (majority at 755 (quoting Clerk's Papers (CP) at 29)); and *762 (2) "[t]he trooper observed that it would have been `easy to conceal something behind or inside' Horrace's heavy leather jacket with its numerous pockets" (majority at 755 (quoting CP at 14)).
But do either of these factors singularly, or even in combination, justify a reasonable inference that Horrace was armed and dangerous?
First, the trooper's observation did not support a reasonable inference that the driver had transferred anything to the passenger, much less a weapon. Second, there was nothing about the passenger, bulky coat and all, which justified a reasonable inference that the passenger was armed and dangerous.
The trooper's testimony that he was concerned that the driver had concealed a weapon in Horrace's jacket (majority at 760), however sincere, neither substitutes for nor satisfies the constitutional predicate that particular facts be objectively demonstrated that reasonably justify the concern. One can well understand an officer's reasonable concern for his safety in the context of almost any traffic stop, arrest, or investigation. However, were we to hold that such concern, in the exercise of normal caution, justified frisking all citizens in proximity for weapons (and seizure of any contraband found in the process), we would expand the limited and carefully defined nature of the exception so broadly as to virtually consume the rights of all citizens. Warrantless search and seizure would then be justified as to any person who might be within shooting range of the officer. Undoubtedly this would promote the interests of officer safety; however many of the provisions of the Bill of Rights as well as our state's Declaration of Rights are designed precisely to protect the citizen at the expense of defeating otherwise legitimate government objectives.
Simply articulating the correct rule of law in theory without applying it in practice vitiates our constitutional protections as surely as never articulating the correct rule of law in the first instance. That, I fear, is precisely what the majority has doneand is reason for dissent.
ALEXANDER, C.J., and JOHNSON, J., concur.
NOTES
[1] The point at which the trooper handcuffed Horrace and placed him under arrest for carrying a concealed weapon is not entirely clear in the record. The trooper testified that he handcuffed and arrested Horrace after the switchblade was discovered. However, the finding provides that, after Horrace admitted he lacked a concealed weapons permit, "[t]he defendant was then arrested and handcuffed. The defendant also stated that he had a knife in his front pocket." Clerk's Papers (CP) at 30; see also Report of Proceedings (RP) (Aug. 20, 1997) at 37. Whether Horrace was arrested before or after the switchblade was discovered, he was in any case arrested prior to the search of his wallet.
[2] That protection encompasses and exceeds the protection guaranteed in the Fourth Amendment of the United States Constitution. Parker, 139 Wash.2d at 493-94, 987 P.2d 73. Because we conclude that the pat-down search at issue in this case did not violate the more expansive protection of article I, section 7, we necessarily conclude that the warrantless search was permissible under the Fourth Amendment.
[3] The Mendez factors include "the number of officers, the number of vehicle occupants, the behavior of the occupants, the time of day, the location of the stop, traffic at the scene, affected citizens, or officer knowledge of the occupants." Mendez, 137 Wash.2d at 221, 970 P.2d 722.
[4] The dissent makes the conclusory statement that "the trooper's observation did not support a reasonable inference that the driver had transferred anything to the passenger, much less a weapon." Dissent at 762. Interestingly, the trooper's assumption that Horrace could have received a weapon from the driver was, in fact, consistent with Horrace's own later contention at trial that the driver, while moving about and digging between the seats, had slipped the methamphetamine into Horrace's wallet as it lay open in his lap.
[5] E.B. WHITE, Fro-Joy, in ONE MAN'S MEAT 109 (Harper Colophon 1983) (1942).
[1] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).