IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32233-5-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CODY RAY FLORES, | ) | UNPUBLISHED OPINION |
| | ) | |
| Respondent. | ) | |

FEARING, J. — We address under what circumstances and to what extent a law enforcement officer may detain and search a companion of another engaged in criminal activity. The trial court suppressed evidence of a gun on the person of Cody Flores, who accompanied one accused of a crime. Although the law enforcement officer had cause to detain Flores, the officer lacked reason to order Flores to walk toward him and to search him. We affirm the trial court.

## FACTS

On November 2, 2013, Moses Lake police dispatch sent all available patrol officers to 1120 Alderwood Drive. Dispatch relayed an anonymous report that Giovanni Powell held a gun to somebody's head at that address. Dispatch also reported an outstanding warrant for the arrest of Powell.

Officer Kyle McCain arrived at 1120 Alderwood Drive first and espied Giovanni Powell ambling with Cody Flores north of the address. The anonymous caller had not mentioned Flores. Officer McCain knew Powell to be a member of the "Base Block" gang. McCain identified Powell from pictures on Facebook, whereon Powell or his friends held firearms. McCain also knew Powell from the latter's testimony as a material witness after one of Powell's best friends was shot and killed in a fight at a Spokane motel. Officer McCain did not recognize or know Cody Flores.

After spotting Giovanni Powell, Officer Kyle McCain exited his car and drew his gun aimed at the ground or at a low ready position. An officer employs the low ready position when he has not identified a specific violent threat, but knows that danger may await in his immediate area. Kyle McCain ordered Giovanni Powell and Cody Flores to stop walking. Powell and Flores complied. Officer McCain ordered each man to place his respective hands on his head, face away from McCain, and kneel on the sidewalk. Powell and Flores obeyed and kneeled about five to seven feet from each other.

Office Kyle McCain stood next to his patrol car and utilized the car as cover, while he paused for other officers to arrive. Giovanni Powell and Cody Flores spoke to each other, and McCain ordered them to cease talking. Kyle McCain directed Flores to move further from Powell, and Flores complied while still on his knees. Another four officers arrived at the Alderwood address, and each drew his gun. Officer McCain and other officers ordered Powell to approach them by walking backward with his hands on

his head. Powell obeyed, and the officers arrested him without harm. Cody Flores never obstructed in the detaining of Giovanni Powell.

Moses Lake Officer Paul Oiumette was one of the other officers who arrived at the Alderwood address. Oiumette assumed control over Cody Flores, who remained kneeling on the street corner with his hands up, facing away from the officers. He had no knowledge of Cody Flores engaging in criminal activity. Nevertheless, Oiumette believed Flores to be involved in the gun incident that prompted the anonymous call to dispatch. Officer Oiumette drew his gun and held it at the low ready position. He instructed Flores to keep his hands where Oiumette could see them and to walk backward to the sound of his voice. Cody Flores rose from his knees and complied. As Flores walked backward, he saw Officer Oiumette's drawn gun.

After Cody Flores walked ten to fifteen feet and neared within twenty feet of Officer Paul Oiumette, Flores peered over his shoulder and notified the officer that Giovanni Powell gave him a gun. Oiumette commanded Flores to keep walking backward. Oiumette asked Flores about the location of the gun, and Flores responded that he carried the firearm in his pants under his jacket. Flores continued to promenade backward. When Flores approached within feet of Officer Oiumette, the officer ordered Flores to kneel, and other officers approached Flores and secured him in handcuffs. With his gun drawn, Oiumette removed the gun from Cody Flores' pants and detained Flores in the back of a patrol car.

3

Moses Lake law enforcement officers reviewed Cody Flores' criminal history and discovered a conviction in October 2012 for residential burglary, a felony disqualifying Flores from possessing a firearm.

PROCEDURE

The State of Washington charged Cody Flores with unlawful possession of a firearm in the first degree, in violation of RCW 9.41.040(1)(a). Cody Flores filed a CrR 3.6 motion to suppress the gun found on his person as the product of an unlawful seizure. Flores argued that the Moses Lake officers lacked an articulable suspicion essential to justify detaining him. At the motion to suppress hearing, Officers Kyle McCain and Paul Oiumette testified. Thereafter the trial court issued a letter opinion, including findings of fact and conclusions of law. Among other findings, the trial court found that the officers lacked individualized articulable suspicion to suspect Cody Flores of criminal activity.

The trial court granted Cody Flores' motion to suppress evidence of the gun found on his person and dismissed the charge against him without prejudice. In the letter opinion, the trial court observed that federal law assumes that all arrestee companions are dangerous and thus are subject to search. The court continued:

> In Washington, however, while a reasonable concern for officer safety justifies a brief detention and protective frisk of an arrestee's companion, proximity to the arrestee, even coupled with general circumstances, such as being in a high crime [area], are insufficient to create a reasonable concern. State v. Adams, 144 Wn. App. 100, 106-07, 181 P.3d 37 (2008). Rather, there must be articulable circumstances

4

particular person in the arrestee's company poses a threat to officer safety to justify that person's detention and frisk. Id.

Here, Mr. Flores was compliant, made no furtive movements, and there is no evidence the officers during the relevant time period were aware of any violent propensities the Defendant may have had. There were, therefore, no grounds under Washington law to detain the Defendant. His motion to suppress is granted.

Clerk's Papers at 56.

## LAW AND ANALYSIS

We outline the arguments raised by the parties in order to circumscribe our analysis. The State of Washington argues that a concern for officer safety justified the detention of Cody Flores and later seizure of the gun on Flores' person. The State contends that Officer Paul Oiumette had a legitimate concern that Giovanni Powell could have passed his gun to Cody Flores. The State, however, does not argue that the *Terry* investigatory stop rule validated Officer Oiumette's search of Flores' person. *Terry v. Ohio*, 392 U.S. 1, 16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)

The State of Washington analogizes this appeal to a case involving the detaining of a passenger in a stopped car. We agree with this analogy, but our agreement harms, not advances, the State's position.

When reviewing claims of unlawful searches and seizures, we often must isolate discrete actions of a police officer during an extended encounter, as if the actions are separate frames in a movie. Cody Flores does not argue that Officer Kyle McCain lacked reason to detain him until officers accomplished the arrest of Giovanni Powell. Flores

5

does not need to assert this argument to be successful. Flores contends that Officer Paul Oiumette lacked grounds, after the arrest of Powell, to require him to walk toward the officer and to search his person. Flores emphasizes that he informed Oiumette of the gun on his person only after Oiumette unlawfully directed him to parade carefully toward the officer.

Cody Flores also argues that the law enforcement officers lacked reasonable suspicion to legitimize a *Terry* stop of Flores. We agree with the State that this latter contention is irrelevant since the State does not substantiate the detention and search of Flores under *Terry*.

As the trial court did, we rely on the Washington constitution, not the Fourth Amendment to the United States Constitution. Article I, section 7, provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." That protection encompasses and exceeds the protection guaranteed in the Fourth Amendment of the United States Constitution. *State v. Horrace*, 144 Wn.2d 386, 392 n.2, 28 P.3d 753 (2001); *State v. Parker*, 139 Wn.2d 486, 493-94, 987 P.2d 73 (1999).

The State of Washington does not assign error to any finding of fact of the trial court. Unchallenged findings, entered after a suppression motion hearing, are verities on appeal. *State v. O'Neill*, 148 Wn.2d 564, 571, 62 P.3d 489 (2003); *State v. Hill*, 123 Wn.2d 641, 647, 870 P.2d 313 (1994).

Whenever a police officer accosts an individual and restrains his freedom to walk away, he has seized the person. *Terry v. Ohio*, 392 U.S. at, 16 (1968). Once an officer seizes an individual, no subsequent events or circumstances retroactively justify the seizure. *State v. Mendez*, 137 Wn.2d 208, 224, 970 P.2d 722 (1999), *abrogated on other grounds by Brendlin v. California*, 551 U.S. 249, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007).

As a general rule, warrantless searches and seizures are per se unreasonable, in violation of the Fourth Amendment and article I, section 7 of the Washington State Constitution. *State v. Duncan*, 146 Wn.2d 166, 171, 43 P.3d 513 (2002). There are five jealously and carefully drawn exceptions to the warrant requirement, which include exigent circumstances, searches incident to a valid arrest, inventory searches, plain view searches, and *Terry* investigative stops. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). The State bears the burden of demonstrating that a warrantless seizure falls into a narrow exception to the rule. *State v. Doughty*, 170 Wn.2d 57, 61, 239 P.3d 573 (2010). This is a strict rule. *State v. White*, 135 Wn.2d 761, 769, 958 P.2d 982 (1998). Exceptions to the warrant requirement are limited and narrowly drawn. *White*, 135 Wn.2d at 769. Whereas, Washington courts repeatedly herald these principles, a court rarely hinges a decision thereon. The principles should teach us that in close calls challenged evidence should be suppressed.

Washington courts have not announced under which of the five exceptions to a search warrant arrestee companion search and seizure fall. One court refused to characterize a companion search as a search incident to arrest, since this exception only justifies the search of the arrestee and his immediate vicinity. *State v. Parker*, 139 Wn.2d at 497 (1999). When a person is not under arrest, there can be no search incident to arrest. *Parker*, 139 Wn.2d at 497. Perhaps the companion search should fall under the exigent circumstances exception or be its own exemption category.

We now outline those detailed rules that control our decision. Merely associating with a person suspected of criminal activity does not strip away the protections of the constitution. *State v. Broadnax*, 98 Wn. 2d 289, 296, 654 P.2d 96 (1982), *abrogated on other grounds by Minnesota v. Dickerson*, 508 U.S. 366, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993). In order for police to lawfully seize an otherwise innocent individual present with an arrestee, the arresting officer must articulate an "objective rationale" predicated specifically on safety concerns, for officers or other citizens to satisfy article I, section 7. *State* v. *Mendez*, 137 Wn.2d at 220 (1999). This "objective rationale" criterion is a less demanding standard than needed for a *Terry* stop. To justify a *Terry* stop, the police officer must identify specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant an intrusion. *Terry*, 392 U.S. at 21; *State v. Armenta*, 134 Wn.2d 1, 10, 948 P.2d 1280 (1997).

The law recognizes that under certain circumstances, unarrested individuals may pose a threat to officer safety in an arrest situation. *State v. Horrace*, 144 Wn.2d at 392-93; *State v. Kennedy*, 107 Wn.2d 1, 11, 726 P.2d 445 (1986). An officer conducting a stop may be endangered not only by the suspect but by companions of the suspect. *Kennedy*, 107 Wn.2d at 11. This threat does not justify unlimited intrusions into the companion's privacy, however. To automatically authorize the search of nonarrested individuals because those individuals happen to be associated with the arrestee, or within the vicinity of the arrest, would distort the narrow limits of the warrant exceptions and offend fundamental constitutional principles. *State v. Parker*, 139 Wn.2d at 497 (1999). The authority to conduct a full blown evidentiary search cannot constitutionally derive from the need to secure officer safety alone. *Parker*, 139 Wn.2d at 499. Because the privacy interest of a nonarrested individual remains largely undiminished, full blown evidentiary searches of nonarrested individuals are constitutionally invalid even when officers may legitimately fear for their safety. *Parker*, 139 Wn.2d at 499. A generalized concern for officer safety has never justified a full search of a nonarrested person. *Parker*, 139 Wn.2d at 501.

When stopping a car for a traffic violation, the officer may take whatever steps necessary to control the scene, including ordering the driver to stay in the vehicle or exit it, as circumstances warrant. *State v. Mendez*, 137 Wn.2d at 220. But with regard to passengers, an officer must be able to articulate an objective rationale predicated

9

specifically on safety concerns for ordering a passenger to stay in the vehicle or to exit the vehicle to satisfy article I, section 7. *Mendez*, 137 Wn.2d at 220. Whether such an articulable, objective rationale exists depends on the circumstances at the scene of the traffic stop. *Mendez*, 137 Wn.2d at 221.

If the officer arrests the driver, the officer may then order an occupant from the car. *State v. Parker*, 139 Wn.2d at 502. Nevertheless, when the purpose of the officer's interaction with the passenger is investigatory, the officer must meet the higher *Terry* standard. *Mendez*, 137 Wn.2d at 220. Stated differently, if the officer searches the person of the nonarrested passenger, the officer must have objective suspicions that the person searched may be armed and dangerous. *State v. Parker*, 139 Wn.2d at 502. When the suspicion that an individual may be armed is based in part on the observable actions of others in a particular context, the officer must point to specific, articulable facts tying those observable movements and their circumstances directly and immediately to the individual to be frisked. *State v. Horrace*, 144 Wn.2d at 399-400 (2001). When officers do not have an articulable suspicion that an individual is armed or dangerous and have nothing to independently connect such person to illegal activity, a search of the person is invalid under article I, section 7. *State v. Parker*, 139 Wn.2d at 498.

Most, if not all, Washington decisions address the stop and frisk of an arrestee's companion in the context of a passenger in a car, rather than one walking on a sidewalk with the arrestee. We consider the passenger cases controlling.

10

In *State v. Mendez*, 137 Wn.2d 208 (1999), police officers detained a car for failing to stop at a stop sign. The car's passenger, Efrain Mendez, exited the vehicle and quickly walked from the scene. Mendez did not heed an officer's command to return to the car and reached inside his shirt two times while running away. Officers chased Mendez, grabbed him, placed him under arrest, and searched him. During the search, they found a marijuana pipe. After denying a CrR 3.6 motion to suppress the marijuana pipe, the trial court found Mendez guilty of possessing paraphernalia.

In reversing the trial court's denial of Efrain Mendez's motion to suppress, the Supreme Court held that the arresting officers possessed neither an objective rationale that would allow them to order Mendez back into the vehicle in order to secure the scene, nor a reasonable suspicion that Mendez had engaged or was about to engage in criminal conduct. Mendez's running from the scene, without evidence that he committed a crime or posed a threat to public safety, did not justify his detention. Moreover, Mendez's gesture of reaching inside his jacket while walking away with his back to the officers occurred after he had been seized by the officer's command to return to the car.

Moses Lake officers possessed reason to seize Cody Flores in order to secure the scene of Giovanni Powell's arrest. Officer McCain initially approached Powell and Flores alone and was entitled to take limited measures to ensure Flores would not interfere in his arrest of Powell. Nevertheless, the seizure exceeded the permissible scope of the objective rationale standard. Contrary to what the State asserts, the officers'

11

objective rationale for detaining Flores does not ripen into a reasonable suspicion of criminal activity sufficient to justify an investigatory seizure. Once Powell was safely in custody, the officers' objective rationale for seizing Flores evaporated, and the officers could no longer lawfully detain and search Flores because, as the trial court correctly found, they lacked a reasonable suspicion that Flores had committed, or was about to commit, a crime, or was a danger to the officers.

Cody Flores exhibited no threatening or aggressive behavior toward the officers. He immediately complied with Officer McCain's every command. Officer Oiumette testified that Flores was in a position of disadvantage by the time he arrived, kneeling on the ground with his hands behind his head, facing away from the officers. The anonymous tip made no mention of Flores, nor did any of the responding officers have reason to believe Flores had dangerous propensities.

Even though arresting law enforcement officers believed Giovanni Powell passed his gun to Flores after they could not find a gun on Powell's person, the record does not show officers forwarded this information to Officer Paul Oiumette. Anyway, any suspicion on Oiumette's part would not validate *Terry*'s reasonable suspicion standard, because Paul Oiumette had no reason to believe Flores could not lawfully possess a weapon. Officer Oiumette testified that he continued to detain Flores after others arrested Powell because he responded to a call about a firearm and he believed Flores was involved with the gun. Officer Oiumette thus admitted that Flores' extended detention

12

was premised on the same anonymous call that the State admits is insufficient to justify a *Terry* stop.

The trial court relied heavily on *State v. Adams*, 144 Wn. App. 100, 181 P.3d 37 (2008). The State argues that the trial court misinterpreted *Adams* as establishing a bright line rule that an officer must have individualized suspicion to seize an arrestee's companion in order for that seizure to comport with Washington's Constitution. We disagree that the trial court misapplied *Adams*.

In *State v. Adams*, we reversed a trial court's denial of a motion to suppress brought by the passenger of a vehicle detained by officers on suspicion of being stolen. 144 Wn. App. at 107. The arresting officer handcuffed both passenger and driver. He asked the passenger, Jennifer Adams, if anything would poke him if he frisked her person. Adams responded that she carried a syringe in her coat pocket, and she gave the officer permission to remove the syringe. When the officer reached in her pocket to retrieve the syringe, the officer found a bag of methamphetamine. The trial court denied her motion to suppress the drug evidence. In reversing the trial court, we held that, when a seized passenger poses no immediate threat to an officer's safety, nor appears armed, *Terry* requires the officer to "'point to specific, articulable facts giving rise to an objectively reasonable belief that the passenger could be armed and dangerous'" in order to justify a protective frisk. *Adams*, 144 Wn. App. at 105 (quoting *State v. Horrace*, 144 Wn.2d 386, 399-400, 28 P.3d 753 (2001). *Adams* supports our holding in this appeal.

13

No. 32233-5-III
*State v. Flores*

The State of Washington relies on *State v. Horrace*, 144 Wn.2d 386, in which the state Supreme Court affirmed the conviction of a car passenger for possession of a concealed weapon. The court sanctioned the pat-down frisk of the passenger because, while the officer returned to his patrol car to check for warrants for the driver, the officer noticed furtive movements between the driver and his passenger, Ronald Horrace. In this appeal, no Moses Lake officer saw Giovanni Powell hand Cody Flores an object, nor did Powell or Flores engage in furtive movements.

## CONCLUSION

We affirm the trial court's suppression of evidence and dismissal of charges against Cody Flores.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

I CONCUR:

_____
Korsmo, J.

14

No. 32233-5-III

BROWN, A.C.J. (concurring in result) — First, Mr. Flores' case was decided by the trial court applying solely the investigative stop principles of *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). While fact finding, the judge unsuccessfully searched the record for "articulable circumstances indicating the particular person in the arrestee's company poses a threat to officer safety to justify that person's detention and frisk." Clerk's Papers (CP) at 56. The judge did not find facts justifying Mr. Flores' continued detention and search after Mr. Powell's arrest. The judge applied *Terry* as did *State v. Adams*, 144 Wn. App. 100, 107, 181 P.3d 37 (2008), a passenger search case. But passenger cases are not distinct from *Terry* or separately "controlling" as the majority reasons. We should not depart from the principles established in *Terry*.

Second, we should defer to the trial court's discretionary fact finding and witness credibility decisions in both letter and spirit. The judge found Mr. Flores was ordered to "walk" backward and did not describe the walk as a "promenade" or "parade." CP at 61. The judge did not criticize the officers' need to safely control Mr. Powell's arrest scene and briefly detain his walking companion, Mr. Flores. Initial police interactions with individuals in *Terry* situations are generally and neutrally described as stops or encounters; thus in *Terry* situations, a police officer initially stops or encounters rather

than "accosts" individuals. "Accost" connotes challenging and aggressive, which is not always true in police encounters. I cannot join in the noted incorrect descriptions.

Accordingly, for these two reasons, I must respectfully concur solely in the result.

_____
Brown, A.C.J.