IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 80738-2-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| BRIAN JACOB ANTHONY, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

HAZELRIGG, J. — Brian Anthony seeks reversal of his convictions for felony hit and run injury/accident and driving under the influence, arguing that the trial court erred in denying his motion to suppress evidence obtained after a warrantless seizure. Because specific and articulable facts known to the police officer who detained him supported a reasonable suspicion that Anthony had engaged in criminal activity, we affirm the trial court's ruling on the suppression motion. Anthony also argues that the court erred in imposing two conditions of community custody. We accept the State's concessions that these conditions are erroneous and remand for modification of his judgment and sentence.

## FACTS

Brian Anthony was charged with hit and run injury/accident and driving while under the influence of intoxicating liquor and/or any drug (DUI). Before trial, Anthony moved to suppress evidence obtained after a traffic stop, arguing that

police stopped him in his vehicle without a reasonable suspicion of criminal activity. He also moved to suppress his statements made to police after his arrest, arguing that the police violated his constitutional right to remain silent. The court held an evidentiary hearing under both CrR 3.5 and CrR 3.6 at which several witnesses testified. The court found the following facts related to the CrR 3.6 motion, which are undisputed.

On November 12, 2017 at 11:42 p.m., Deputy Matthew Houghtaling received a dispatch report of a hit and run collision involving a fleeing white Jeep Grand Cherokee. When he arrived at the scene of the accident eight minutes later, he saw a white Acura Integra parked on the northbound shoulder of Locust Way. The rear driver's side door had been pushed forward toward the front of the car until it was nearly flush with the closed driver's door. The interior door panel was lying in the northbound lane. Nathan Barnhart was also lying in the northbound lane just north of the front of the Acura, bleeding from the head and apparently unconscious. A witness, Manuel Jewell, told Houghtaling that the vehicle that hit Barnhart and the Acura was a 1990s model white Jeep Grand Cherokee. Jewell stated that the Jeep had briefly stopped in the road before continuing to drive northbound, but the driver did not identify themselves. Jewell did not see the Jeep's license plate.

Houghtaling radioed a description of the fleeing vehicle to other deputies. He found broken pieces of plastic on the road, which appeared to him to be from the broken headlight and turn signal of the fleeing vehicle. He also found an intact rectangular headlight cover. Detective Marc Monson, an experienced collision re-

constructionist, arrived at 1:30 a.m., examined the scene, and spoke to Jewell. Jewell told Monson that there would likely be damage to the front passenger side of the fleeing vehicle.

At 2:02 a.m., Deputy David Adams was driving eastbound, 4.3 miles from the collision scene. Adams was driving in the outside eastbound lane and noticed a 1990s model white Jeep Grand Cherokee behind him in the inside eastbound lane. The Jeep's passenger side headlight was not illuminated. Adams saw bent metal protruding from the headlight area. He slowed to let the Jeep pass and inspected the passenger side of the vehicle as it went by. He concluded that it matched the description of the fleeing vehicle and made a traffic stop of the Jeep.

Adams discovered that Anthony was the driver of the Jeep. While speaking to Anthony, Adams noticed an unusually pungent odor of marijuana coming from the interior of the Jeep. Adams saw that Anthony's eyes were glazed over and he was generally lethargic. Adams suspected that Anthony was under the influence of marijuana. Adams asked Anthony how his Jeep had gotten damaged, and Anthony replied that he had hit an object in a grocery store parking lot.

Monson heard about the traffic stop over the radio and drove to the location of the stop. He saw damage to the passenger headlight area of the Jeep and noticed that the headlight cover was missing. He also observed blue smudges on the front passenger side corner of the bumper, which he knew from training and experience to be consistent with striking a person wearing blue jeans. Barnhart had been wearing blue jeans when he was hit. Monson also saw shards of broken

glass at the base of the Jeep's front windshield and concluded that the shards were from the shattered window of the Acura's rear driver's side door.

While Monson was inspecting the Jeep, Houghtaling arrived and spoke to Anthony. Anthony told Houghtaling that the Jeep was damaged when he struck a shopping cart corral at WinCo Foods. Both Monson and Houghtaling smelled a very strong odor of marijuana coming from the Jeep. Anthony's speech was slurred, his eyes were glossy, and his pupils were very dilated. He told Monson that no one else had driven the Jeep that night.

Anthony was placed under arrest for DUI and hit and run injury/accident. At the police station, he admitted that he had hit something on Locust Way, then panicked and drove away. Anthony wrote a three-page statement.

After the hearing, the court concluded that the traffic stop performed by Adams was based on reasonable and articulable facts that supported his conclusion that the Jeep was the fleeing vehicle from the earlier hit and run. The court found that the traffic detention was legal and denied Anthony's motion to suppress evidence obtained as a result of the stop.

Anthony was convicted after a stipulated bench trial on agreed documentary evidence. The court imposed a first-time offender sentence of 90 days confinement on the hit and run felony, followed by a period of community custody, and 90 days on the misdemeanor DUI with 274 days suspended. Anthony appealed.

ANALYSIS

I.    Motion to Suppress

Anthony contends that the specific and articulable facts known to the officer at the beginning of the traffic stop did not provide a reasonable suspicion of criminal activity.  Therefore, he argues, the warrantless seizure violated his constitutional right to privacy, the trial court erred in concluding that the traffic stop was legal, and the trial court erred in denying his motion to suppress.

We view unchallenged findings of fact as verities on appeal.  State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).  The trial court's conclusions of law on a motion to suppress are reviewed de novo.  State v. Horrace, 144 Wn.2d 386, 392, 28 P.3d 753 (2001).

"A traffic stop is a seizure for purposes of constitutional analysis."  State v. Doughty, 170 Wn.2d 57, 62, 239 P.3d 573 (2010).  Warrantless seizures are per se unreasonable under both the Fourth Amendment to the United States Constitution and Article I, section 7 of the Washington State Constitution unless they fall into a narrow exception to the warrant requirement.  Id. at 61.  The State bears the burden to show that an exception applies.  State v. Ladson, 138 Wn.2d 343, 350, 979 P.2d 833 (1999).

"The Terry[1] stop—a brief investigatory seizure—is one such exception to the warrant requirement."  Doughty, 170 Wn.2d at 61–62.  A police officer may briefly detain a person for questioning without a warrant when the officer has a reasonable suspicion that the person stopped has been or is about to be involved

---

[1] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

in a crime. State v. Acrey, 148 Wn.2d 738, 746–47, 64 P.3d 594 (2003). For a Terry stop to be valid, the reasonable suspicion of criminal activity must be based on specific and articulable facts known to the officer at the beginning of the stop. State v. Fuentes, 183 Wn.2d 149, 158, 352 P.3d 152 (2015). When evaluating the reasonableness of the officer's suspicion, we consider the totality of the circumstances, including the officer's training and experience, the location of the stop, the conduct of the detained person, the purpose of the stop, and the degree of physical intrusion on the suspect's liberty. Id.

When a party claims both state and federal constitutional violations, we address the state constitutional claim first. State v. Patton, 167 Wn.2d 379, 385, 219 P.3d 651 (2009). Article I, section 7 of the Washington State Constitution provides greater protection of individual privacy rights than the Fourth Amendment to the United States Constitution. State v. Harrington, 167 Wn.2d 656, 663, 222 P.3d 92 (2009). Although the reasonable suspicion standard requires that the suspicion be grounded in specific and articulable facts under either constitutional analysis, the state constitution "generally requires a stronger showing by the State." State v. Z.U.E., 183 Wn.2d 610, 617–18, 352 P.3d 796 (2015). "The available facts must substantiate more than a mere generalized suspicion that the person detained is 'up to no good'; the facts must connect the particular person to the particular crime that the officer seeks to investigate." Id. at 618 (quoting State v. Bliss, 153 Wn. App. 197, 204, 222 P.3d 107 (2009)).

Anthony argues that the facts known to Adams at the time of the stop were innocuous. He characterizes the facts known to Adams as follows:

> (1) At 2:02 [a.m.], about 1 hour and 20 minutes after the hit and run occurred, Deputy Adams observed a 90's model white Jeep Cherokee; (2) this was 4.3 miles away from the collision scene; (3) Adams saw the Cherokee's passenger side headlight was not illuminated; and (4) Adams saw bent metal protruding from the headlight area.

Anthony contends that these facts are insufficient to provide reasonable suspicion of criminal activity because the make, model, and date range of the vehicle, as well as the type of damage to the vehicle, were not unusual or exceptional. However, Adams did not pull the vehicle over because of these characteristics alone; he performed the traffic stop because he knew that a similar vehicle had been involved in a hit and run collision just over an hour before and less than five miles away. The facts known to Adams connected the particular person detained (Anthony, the driver of the Jeep) with the particular crime he sought to investigate (the hit and run collision). The trial court did not err in determining that Adams had a reasonable suspicion of criminal activity, that the warrantless seizure was justified, and that Anthony's motion to suppress should be denied.

II.    Conditions of Community Custody

Anthony also challenges two conditions of community custody. First, he argues that the court erred in imposing a condition prohibiting him from purchasing, possessing, or consuming controlled substances, including marijuana, "unless prescribed by [a] physician." He contends that the portion of the condition requiring a physician to prescribe controlled substances is too limiting because physicians are not the only medical professionals who can lawfully issue prescriptions.[2]

---

[2] See RCW 69.50.101(mm), (nn); RCW 69.50.308.

By statute, the trial court has the authority to impose a condition of community custody ordering an offender to "[r]efrain from possessing or consuming controlled substances except pursuant to lawfully issued prescriptions." RCW 9.94A.703(2)(c). The State concedes that remand is appropriate to remove the reference to a physician and "clarify that such possession or consumption of controlled substances is prohibited except pursuant to 'lawfully issued prescriptions.'" We accept the State's concession and remand for modification of this condition.

Anthony also challenges the imposition of Department of Corrections supervision fees as a condition of community custody. He argues that the court intended to impose only mandatory legal financial obligations (LFOs) and inadvertently failed to strike the boilerplate language imposing this cost. In State v. Dillon, this court noted that supervision fees are discretionary and found that the record demonstrated that the trial court intended to waive all discretionary LFOs when it imposed only mandatory LFOs at sentencing. 12 Wn. App. 2d 133, 152, 456 P.3d 1199 (2020). The State concedes that remand is appropriate to strike the supervision fee language from the judgment and sentence in light of Dillon. We accept this concession and remand to strike the relevant language.

Affirmed in part, reversed in part, and remanded.

WE CONCUR: