This opinion was filed for record

at 8 a.m. on Sep. 15, 2016

~~Susan L. Carlson~~
SUSAN L. CARLSON
Supreme Court Clerk

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF
WASHINGTON

DATE SEP 1 5 2016

Madsen, C.J.
CHIEF JUSTICE

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                     Petitioner,<br><br>      v.<br><br>CODY RAY FLORES,<br><br>                    Respondent. | NO. 91986-1<br><br>EN BANC<br><br>Filed   SEP 1 5 2016 |

STEPHENS, J.—This case requires us to decide under what circumstances officers making a lawful arrest may seize a companion of the arrestee in the absence of reasonable suspicion to independently justify a *Terry*[1] stop of the companion. We hold that where officers have an objective rationale predicated on safety concerns to seize a companion to secure the scene of the arrest, article I, section 7 of the Washington State Constitution allows for the seizure, so long as it remains reasonable in scope and duration. Based on this holding, we reverse the Court of Appeals and hold that evidence of the gun taken from Cody Flores during his brief seizure should not have been suppressed.

---

[1] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

## FACTS AND PROCEDURAL HISTORY[2]

On November 2, 2013, the Moses Lake Police Department dispatched all available patrol officers to an address in Moses Lake. An anonymous source[3] had reported that Giovanni Powell was at that address and had pointed a gun at someone's head. Officer Kyle McCain was first to arrive at the scene. McCain was familiar with Powell, had seen pictures of him holding firearms, knew he was in a gang, and knew he was a material witness to a Spokane homicide.[4] While en route, dispatch informed McCain (and other officers who were following him) that "Powell had a warrant out for his arrest in the Spillman police information system. This warrant was later confirmed after Powell was stopped." Clerk's Papers (CP) at 60.

---

[2] Except where indicated, the facts established by the trial court are unchallenged and thus are verities on appeal. *See State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

[3] Flores assigned error to the trial court's finding of fact 2.1, which referred to the source as "she." *See* Resp't's Br. at 16; Clerk's Papers (CP) at 59. Flores argues "[t]here was nothing in the record to support the finding that the caller was a female who stated that she wished to remain anonymous." Resp't's Br. at 16. Testimony supports the statement that the caller wanted to remain anonymous. *See* Verbatim Report of Proceedings (Jan. 15, 2014) (VRP) at 67, 87. However, Flores is correct that there is nothing in the record to support a finding that the caller was female. This aspect of finding of fact 2.1 is not binding on appeal. *See Hill*, 123 Wn.2d at 647.

[4] Flores also challenged finding of fact 2.2, arguing that the language is misleading. Resp't's Br. at 20. McCain testified that he is familiar with Powell, has "seen pictures of him holding firearms or friends of his holding firearms," and had "knowledge that [Powell is] in a gang called the Base Block." VRP at 69. McCain stated he "believe[d] that [Powell] was a material witness" to a shooting incident in Spokane. *Id.* There is sufficient evidence to support a finding that McCain was familiar with Powell and knew that Powell was in pictures holding firearms, was associated with gang members, and was a material witness to a homicide in Spokane. There is not sufficient evidence to support that Powell was involved in a *gang* homicide. *See* CP at 60 (finding of fact 2.2 states Powell "was a material witness in a gang homicide in Spokane"). This aspect of finding of fact 2.2 is not binding on appeal. *See Hill*, 123 Wn.2d at 647.

Officer McCain arrived at the reported address less than five minutes from the time of the call, around 4:40 p.m. He observed Powell, whom he recognized, and another person (later identified as Flores) walking down the street together. McCain did not recognize Flores and did not have an individualized, articulable reason to suspect Flores of criminal activity. Officers testified they were concerned that Flores posed a threat to their safety because of "his association and close proximity to Powell within a few minutes of a report of Powell pointing a gun at someone's head." *Id.*

McCain "parked across the street from Powell and Flores, got out of his car, drew his side arm, held it pointed at the ground, and ordered . . . Powell to stop." *Id.* Both Flores and Powell stopped. McCain ordered Powell and Flores to drop to their knees with their hands up, a position of disadvantage. Powell and Flores were talking, so "McCain ordered Powell to move away from Flores." *Id.* Powell complied, moving about six feet away. McCain then "ordered Powell to walk backwards towards him with his hands up." *Id.*

As this was occurring, other officers arrived, including Officer Paul Oiumette. *Id.* In total, there were approximately five officers on the scene. All had their guns drawn and held at the "low ready" position. *Id.* "While Officer McCain was securing Powell[,] Officer Oiumette ordered Flores to walk backwards towards him with his hands up." *Id.* at 61. "As he was walking backwards towards Officer Oiumette[,] Flores told the Officer he had a gun. This statement was not in response to a question from Officer Oiumette." *Id.* Oiumette told Flores to keep walking backward and they would deal with the gun in a minute. Once Flores got to Oiumette, Oiumette asked

-3-

where the gun was. Flores responded that it was in his pants. Oiumette removed and secured the gun. *Id.* The State charged Flores with first degree unlawful possession of a firearm.

Flores brought a CrR 3.6 motion to suppress all evidence of the gun, arguing that Oiumette's command to walk backward constituted a second seizure that was not predicated on articulable suspicion that Flores was involved in criminal activity. *See id.* at 12-17 (Flores's CrR 3.6 motion). Judge John Knodell granted the motion to suppress "the gun found on . . . Flores and his statements pertaining to it," concluding that "[p]ursuant to RAP 2.2(b)(2) . . . the practical effect of this order is to terminate the case." *Id.* at 62. Judge Evan Sperline then dismissed the charges without prejudice. *Id.* at 67. The State appealed, and Division Three of the Court of Appeals affirmed. *State v. Flores*, 188 Wn. App. 305, 351 P.3d 189 (2015). The State petitioned this court for review, which we granted. *State v. Flores*, 184 Wn.2d 1019, 361 P.3d 747 (2015).

ANALYSIS

The primary question in this case is whether it is always a violation of article I, section 7 of the Washington State Constitution for an officer to seize the nonarrested companion of an arrestee to secure the scene of an arrest. The Washington State Constitution protects individuals from unlawful searches and seizures. WASH. CONST. art. I, § 7 ("No person shall be disturbed in his private affairs, or his home invaded, without authority of law."); *see also State v. Harrington*, 167 Wn.2d 656, 663, 222 P.3d 92 (2009) ("Because searches and seizures incontrovertibly disturb private affairs, article I, section 7 envelops search and seizure."). It is well established that article I,

section 7 "grants greater protection to individual privacy rights than the Fourth Amendment." *Harrington*, 167 Wn.2d at 663 (citing U.S. CONST. amend. IV). There is almost an absolute bar to warrantless seizures, with only limited, "jealously guarded exceptions." *State v. Valdez*, 167 Wn.2d 761, 773, 224 P.3d 751 (2009).

"Our analysis under article I, section 7 requires us to determine 'whether the State unreasonably intruded into the defendant's "private affairs."'" *State v. Mendez*, 137 Wn.2d 208, 219, 970 P.2d 722 (1999) (quoting *State v. Myrick*, 102 Wn.2d 506, 510, 688 P.2d 151 (1984)), *abrogated on other grounds by Brendlin v. California*, 551 U.S. 249, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007). The analysis focuses "'not on a defendant's actual or subjective expectation of privacy but, as we have previously established, on those privacy interests Washington citizens held in the past and are entitled to hold in the future.'" *Id.* (quoting *State v. White*, 135 Wn.2d 761, 768, 958 P.2d 982 (1998)). "The violation of [an individual's] right of privacy under article I, section 7 automatically implies the exclusion of the evidence seized." *State v. Afana*, 169 Wn.2d 169, 179, 233 P.3d 879 (2010). We review "conclusions of law from an order pertaining to the suppression of evidence de novo." *State v. Duncan*, 146 Wn.2d 166, 171, 43 P.3d 513 (2002).

Under our state constitution, an individual is seized "when considering all the circumstances, an individual's freedom of movement is restrained and the individual would not believe he . . . is free to leave or decline a request due to an officer's use of force or display of authority." *State v. Rankin*, 151 Wn.2d 689, 695, 92 P.3d 202 (2004). "This determination is made by objectively looking at the actions of the law

enforcement officer." *Id.* There is no doubt here that Flores was seized, and indeed, the State concedes that he was seized when McCain stopped him and Powell and ordered them into a position of disadvantage. *See* CP at 19 (State's Resp. to Def.'s Mot. to Suppress Under CrR 3.6).

Flores challenges his seizure as an unlawful *Terry* stop. *See* Resp't's Br. at 27-46; Resp't's Answer to Pet. for Review at 13-16. Flores asserts that the seizure should be analyzed in two parts: the initial seizure when McCain first ordered Flores into a position of disadvantage, and a second seizure when Oiumette ordered Flores to move back toward him. Resp't's Answer to Pet. for Review at 12. Although Flores does not concede that McCain's initial detention of him was permissible, *see* Resp't's Br. at 33; Resp't's Answer to Pet. for Review at 12, he contends that even if the initial seizure by McCain was justified by the need to secure the scene of Powell's arrest, that justification "evaporated the moment that Powell, having complied with officer's directives that he get down on his knees, continued to follow Officer McCain's orders . . . . At this point in time, the scene was secured, Powell was safely under control, and there was no need to further intrude on Flores' liberty by ordering him to walk backwards to the sound of Officer Oiumette's voice." Resp't's Br. at 33. Flores insists that the second seizure was investigatory and an unlawful *Terry* stop because the State failed to show it was reasonable and necessary. Resp't's Answer to Pet. for Review at 15-16. Finally, Flores argues that this court should hold that vehicle stop cases involving the rights of passengers do not control cases where the companion and arrestee are pedestrians. *Id.* at 17-20.

The State counters that *Terry* is inapplicable because officers did not seize Flores for investigative purposes. Rather, the State argues that under *State v. Parker*, 139 Wn.2d 486, 987 P.2d 73 (1999) (plurality opinion), and *Mendez*, McCain and Oiumette acted within their authority to control the scene of an arrest when they directed Flores's movements. *See* Pet. for Review at 4-6; Pet'r's Suppl. Br. to Pet. for Review at 3, 6-8. The State contends that the circumstances here are not materially different from when the driver of a car has been arrested and the police may order the passenger in or out of the car to secure the scene of the arrest. *See* Pet. for Review at 4-5. Under *Mendez*, the court should review the officer's actions for an "'objective rationale'" for seizing the companion of an arrestee. *Id.* at 5-7. Under *Parker*, the fact of an arrest meets this test. *Id.* at 5-6. Here, the State asserts the officers had an objective rationale. *See id.* at 6. Furthermore, the court should apply a deferential standard when reviewing officers' actions that are taken in the interest of safety. *Id.*

The American Civil Liberties Union of Washington (ACLU) filed an amicus brief arguing that while the Court of Appeals was correct in suppressing the evidence, it did not go far enough. The ACLU argues that under article I, section 7, there was no justification to seize Flores in the first place because the State "failed to provide an individualized objective rationale based on safety concerns." Br. of Amicus Curiae ACLU of Wash. at 7. The ACLU also argues *Mendez* and *Parker* should not apply to pedestrian cases. *Id.* at 2, 11-16.

Our precedent favors the State's argument. The risks that companions pose to police attempting to arrest an individual are similar whether the companion and arrestee

are in a car or on a sidewalk. The officer safety rationale that underlies our reasoning in *Mendez* and *Parker* applies with equal force whenever officers make an arrest. We therefore adopt the objective rationale test for when an officer may seize companions to control the scene of an arrest. When that test is met, it is not a violation of article I, section 7 for an officer to seize a nonarrested companion of an arrestee. The objective rationale test was met under the facts of this case. We therefore reverse the Court of Appeals and hold that the evidence of the gun should not have been suppressed.

### I. Officers May Order a Nonarrested Companion of an Arrestee to a Position Necessary to Secure the Scene of the Arrest

The court's decisions in *Mendez* and *Parker* provide a useful framework for analyzing this case. In *Mendez*, the court addressed the scope of police officers' authority over passengers in an automobile when the officers have probable cause to detain the driver for a traffic infraction. In that case, two police officers stopped a car that ran a stop sign. *Mendez*, 137 Wn.2d at 212. As soon as the vehicle stopped, Mendez, a passenger who had been in the front seat, got out and began walking away. Approaching the vehicle, one of the officers told him to get back into the vehicle, but Mendez turned, fumbled with his shirt, and continued walking away. He then ran and was chased on foot by one of the officers. Mendez was arrested for obstructing a public servant, and in the search incident to arrest, the officers found a marijuana pipe. Mendez moved to suppress the evidence of the marijuana pipe.

This court examined the question under article I, section 7, explaining that we must balance the privacy interests that Washingtonians held in the past and have a right

to hold in the future "against concerns for officer safety during traffic stops." *Id.* at 219. "Plainly, in any traffic stop, concerns about officer safety and control of the situation are entirely relevant." *Id.*

The court concluded, "Washington's constitutional policy of greater protection to the privacy of individuals in automobiles than the Fourth Amendment provides must carry the day." *Id.* at 220. Although the court found that with regard to drivers, officers have authority to "take whatever steps [are] necessary to control the scene, including ordering the driver" in or out of the vehicle, it declined to adopt a categorical rule with regard to passengers. *Id.* It explained,

> A police officer should be able to control the scene and ensure his or her own safety, but this must be done with due regard to the privacy interests of the passenger, who was not stopped on the basis of probable cause by the police. An officer must therefore be able to articulate an objective rationale predicated specifically on safety concerns, for officers, vehicle occupants, or other citizens, for ordering a passenger to stay in the vehicle or to exit the vehicle to satisfy article I, section 7. This articulated objective rationale prevents groundless police intrusions on passenger privacy. But to the extent such an objective rationale exists, the intrusion on the passenger is de minimis in light of the larger need to protect officers and to prevent the scene of a traffic stop from descending into a chaotic and dangerous situation for the officer, the vehicle occupants, and nearby citizens.

*Id.*

To meet this objective rationale standard, an officer need not meet the standard required for a *Terry* stop. *Id.* "*Terry* must be met if the purpose of the officer's interaction with the passenger is investigatory. For purposes of controlling the scene of the traffic stop and to preserve safety there, we apply the standard of an objective rationale." *Id.*

-9-

The court provided a list of nonexclusive factors that may warrant an officer controlling the movement of a passenger. *Id.* at 220-21. These factors include "the number of officers, the number of vehicle occupants, the behavior of the occupants, the time of day, the location of the stop, traffic at the scene, affected citizens, or officer knowledge of the occupants." *Id.* at 221. Emphasizing the flexibility of this analysis, the court concluded that "[t]he inquiry into the presence or absence of an objective rationale requires consideration of the circumstances present at the scene of the traffic stop." *Id.*

Under the facts in *Mendez*, the officers did not satisfy the objective rationale test. *Id.* at 222-26. One of the officers testified that "he had no suspicions Mendez had engaged or was about to engage in criminal conduct." *Id.* at 224. "Neither officer testified that Mendez's actions in reaching inside his clothing aroused any suspicion. Besides, Mendez did not reach inside his clothing until *after* he had been seized by [the officer's] command to return to the car." *Id.* "'Obviously, once an individual is "seized," no subsequent events or circumstances can retroactively justify the "seizure."'" *Id.* (quoting *State v. Stinnett*, 104 Nev. 398, 760 P.2d 124, 126 (1988)). The officers were unable to clearly articulate a reason to order Mendez to stay in the car. Mendez "was already walking away when he was told to stop," the stop took place in broad daylight, there were no specific safety concerns at the scene, the officers "had control of the situation as the driver remained where he was directed," and he had not committed any crime. *Id.* at 225-26. Thus, there was no objective rationale that the officers could articulate to justify Mendez's seizure. Although the officers were unable

to meet the objective rationale test, the court was clear that the situation could have been different "had Mendez remained standing by the passenger side door, had he behaved in any way the police viewed as threatening or potentially dangerous, or had the scene at the traffic stop required him to stay in the vehicle." *Id.* at 225.

The same year the court decided *Mendez*, it also decided *Parker*. *See id.* at 214 n.2 (distinguishing *Mendez* from *Parker*). In *Parker*, the court considered "whether the personal belongings of nonarrested vehicle passengers are subject to search incident to the arrest of the driver." 139 Wn.2d at 489. In a plurality decision, the court held that "the arrest of one or more vehicle occupants does not, without more, provide the 'authority of law' under article I, section 7 of our state constitution to search other, nonarrested vehicle passengers, including personal belongings clearly associated with such nonarrested individuals." *Id.* at 502-03; *see id.* at 518 (Alexander, J., concurring in part, dissenting in part) ("While I agree with the majority's conclusion that if officers of the law 'know' that a container belongs to a passenger it may not be searched incident to the arrest of the driver, I disagree that the officers should be similarly inhibited if they merely 'should know.'"); *see also State v. Horrace*, 144 Wn.2d 386, 392, 28 P.3d 753 (2001) (describing *Parker*'s holding).

Both the lead and one of the concurring opinions in *Parker* recognized "that under certain circumstances nonarrested individuals may pose a threat to officer safety in an arrest situation." 139 Wn.2d at 501, 516-17 (Talmadge, J., concurring). To protect officer safety and individuals' article I, section 7 rights, the court "engage[s] in a delicate balancing of interests, weighing safety and evidentiary concerns against the

basic notion that the people of this state enjoy a measure of privacy that is, and will forever be, unassailable." *Id.* at 501. "As against the privacy interests of a nonarrested individual, the balance has already been struck." *Id.* Although companions may pose a danger to law enforcement, officers may not engage in a full search of a nonarrested companion; instead, any search of the companion "is limited to ensure officer safety only and must be supported by objective suspicions that the person searched may be armed or dangerous." *Id.* at 501-02. The lead opinion concluded, however, that, whether or not articulable suspicion exists sufficient to justify a pat down for weapons, the circumstance of an arrest falls squarely within the rule of *Mendez*. Thus, a vehicle stop and arrest in and of itself provides officers an objective basis to ensure their safety by "'controlling the scene,'" including ordering passengers in or out of the vehicle as necessary. *Id.* at 502. A concurrence stated that the risks nonarrested passengers may pose to law enforcement "can be addressed under *Mendez* or pursuant to *Terry*." *Id.* at 516-17 (Talmadge, J., concurring).

The situations presented in *Mendez* and *Parker* are analogous to the facts of this case. Flores argues that automobile cases are unique because we have developed a line of vehicle-specific jurisprudence. One of the primary justifications is the mobility of vehicles. *See, e.g., State v. Day*, 161 Wn.2d 889, 897, 168 P.3d 1265 (2007) (explaining that "*Terry* has also been extended to traffic infractions, 'due to the law enforcement exigency created by the ready mobility of vehicles'" (quoting *State v. Johnson*, 128 Wn.2d 431, 454, 909 P.2d 293 (1996)); *State v. Patterson*, 112 Wn.2d 731, 774 P.2d 10 (1989) (recognizing a vehicle's potential mobility as one exigent circumstance, but

holding there must be additional exigencies to justify a warrantless search of a parked, unoccupied vehicle). However, the court in *Mendez* and *Parker* was not concerned with the mobility of the vehicle, but with the threat that companions in the vehicle— those who are close in proximity to the subject of the stop—pose to officers. In *Mendez*, we described our test as "predicated specifically on safety concerns," 137 Wn.2d at 220, and in *Parker* we noted that "the search incident to arrest exception functions primarily to achieve [officer safety]," 139 Wn.2d at 499. Because the analysis in *Mendez* and *Parker* centered on safety concerns rather than the location of the stop, it should not be restricted to traffic stops, but is equally applicable in cases like this one where an arrestee is accompanied by companions at the time of the arrest.

This conclusion is common sense, as the potential danger at an arrest scene does not turn on whether people are sitting together in a car or walking side by side on a sidewalk. Companions in either circumstance could, for example, be concealing a weapon that could be used against the arresting officer. *Cf. Horrace*, 144 Wn.2d at 395-98 (recognizing a vehicle passenger's close proximity to a driver making unexplained movements and the passenger's bulky jacket that the officer believed capable of concealing a weapon were factors that helped justify a frisk of the passenger). In both situations, when an officer is attempting to execute an arrest warrant, those close to the subject pose a potential safety risk. *Cf. id.*; *State v. Kennedy*, 107 Wn.2d 1, 12, 726 P.2d 445 (1986) (In an investigative vehicle stop, "the officer may search for weapons within the investigatee's immediate control. We also recognize that such a limited search applies to any companion in the car because that person presents a similar

danger to the approaching officer. The front seat of the car is in the immediate control of a passenger seated next to the driver."); Verbatim Report of Proceedings (Jan. 15, 2014) (VRP) at 75 (McCain testified that he moved Powell away from Flores because he "didn't want them speaking to each other or passing anything from one person to the other").

There is no sensible basis to compartmentalize *Mendez* and *Parker* as "vehicle" cases and to create a separate line of "pedestrian" cases. As explained, the fact that the seizures in *Mendez* and *Parker* occurred in the vehicle context was not central to the analysis. To determine which standard we use to evaluate the legality of a seizure, we do not focus on the seizure's *location*; rather, we focus on its *purpose*. *See, e.g., Mendez*, 137 Wn.2d at 220 ("*Terry* must be met if the purpose of the officer's interaction with the passenger is investigatory. For purposes of controlling the scene of the traffic stop and to preserve safety there, we apply the standard of an objective rationale."). Where the stop is for investigative purposes, we require officers to meet the *Terry* standard of individualized, reasonable, articulable suspicion. *See, e.g., State v. Fuentes*, 183 Wn.2d 149, 352 P.3d 152 (2015) (applying the *Terry* standard to determine whether officers had reasonable suspicion of criminal activity to engage in two investigative stops outside an apartment complex); *Horrace*, 144 Wn.2d at 394 (applying *Terry*, a pedestrian case, to determine the validity of a stop-and-frisk of a vehicle passenger because the officer's conduct was "investigatory"). However, when a stop is conducted to effectuate an arrest, we require a valid arrest warrant or probable cause. *See State v. Massey*, 68 Wn.2d 88, 89, 411 P.2d 422 (1966) (describing the

general rules for a warrantless arrest); *State v. Manning*, 57 Wn.2d 327, 329, 356 P.2d 721 (1960) ("the issuance of the [arrest] warrant is authority to not only apprehend a defendant but to continue his custody as the case may be"). Yet another standard exists when an officer engages in a purported social contact. In those situations, we determine if the contact was in fact a seizure—rather than merely a social contact—based on whether a reasonable person would believe he was not free to leave. *See, e.g., State v. Young*, 135 Wn.2d 498, 513-14, 957 P.2d 681 (1998) (holding shining a spotlight on an individual "did not amount to such a show of authority a reasonable person would have believed he or she was not free to leave" and thus was not a seizure). As these cases demonstrate, the standard we use to evaluate the legality of a seizure is determined by the purpose of the seizure. We therefore reject Flores's argument that we should ignore the objective rationale test established in *Mendez* and *Parker* because those were "vehicle" cases.

Because the situations contemplated in *Mendez* and *Parker* are analogous to the one presented here, we follow the analysis developed in those cases. However, we reject the State's argument that *Parker* established a per se rule that the fact of an arrest is sufficient to satisfy *Mendez*'s objective rationale test. *See* Pet. for Review at 5-6. The statement in the lead opinion that arguably supports this proposition was not joined by either of the concurring justices and, thus, is not binding law. *See Parker*, 139 Wn.2d at 502. Furthermore, this court has characterized that statement as supplying but one *factor* officers may consider as part of the objective rationale test, without suggesting that an arrest by itself satisfies the officers' burden. *See Horrace*, 144 Wn.2d at 393

("[t]he lead opinion in *Parker* noted that the arrest of another vehicle occupant supplied a *significant factor*" in meeting the objective rationale test (emphasis added)); *State v. Reynolds*, 144 Wn.2d 282, 288-89, 27 P.3d 200 (2001) (the lead opinion in *Parker* "recognized that the arrest of a vehicle occupant (a circumstance not present in *Mendez*) supplied an *additional factor* that an officer *could* consider when controlling the scene of a vehicle stop" (emphasis added)). We therefore consider an arrest to be a factor officers may take into account when assessing whether they have an objective rationale for seizing companions to control the scene.[5]

---

[5] Were we to agree with the State, we would, in effect, be adopting a variation of the "automatic companion rule." Under the automatic companion rule, "[a]ll companions of the arrestee within the immediate vicinity, capable of accomplishing a harmful assault on the officer, are constitutionally subjected to the cursory 'pat-down' reasonably necessary to give assurance that they are unarmed." *United States v. Berryhill*, 445 F.2d 1189, 1193 (9th Cir. 1971). Under this rule, an officer may conduct a frisk for weapons of an arrestee's companions without individualized, articulable suspicion of criminal activity or dangerousness. *See, e.g., Owens v. Commonwealth*, 291 S.W.3d 704, 709-12 (Ky. 2009) (describing and adopting the automatic companion rule for vehicle passengers when the driver has been arrested and the passengers have been lawfully removed from the vehicle); *Perry v. State*, 927 P.2d 1158, 1163-64 (Wyo. 1996) (describing and adopting automatic companion rule when there was a lawful arrest and a justifiable concern for officer safety). We reject the automatic companion rule as inconsistent with our precedent and with the rule we announce today. *See, e.g., Mendez*, 137 Wn.2d at 220; *cf., e.g., United States v. Bell*, 762 F.2d 495, 498-99 (6th Cir. 1985) (rejecting the automatic companion rule because "we have serious reservations about the constitutionality of such a result under existing precedent" and noting that "we do not believe that the *Terry* requirement of reasonable suspicion under the circumstances has been eroded to the point that an individual may be frisked based upon nothing more than an unfortunate choice of associates" (citation omitted)); *State v. Lemert*, 843 N.W.2d 227, 233 (Minn. 2014) (rejecting the automatic companion rule in the Fourth Amendment context, finding that "although being a companion to an arrestee is part of the totality of the circumstances, the Fourth Amendment does not provide for an *automatic* search of an arrestee's companion"). Contrary to the dissent's characterization, our holding does not create any new "exception" to the Fourth Amendment or article I, section 7.

We hold that when executing an arrest, officers may seize nonarrested companions to control the scene of the arrest if they can articulate an objective rationale predicated specifically on safety concerns for the officers, the arrestee, his or her companions, or other citizens. Factors that warrant an officer seizing companions include (but are not limited to) the arrest, the number of officers, the number of people present at the scene of the arrest, the time of day, the behavior of those present at the scene, the location of the arrest, the presence or suspected presence of a weapon, officer knowledge of the arrestee or the companions, and potentially affected citizens. *See Mendez*, 137 Wn.2d at 221. This is not an exhaustive list, and no one factor by itself justifies an officer's seizure of nonarrested companions. *See id.* When determining whether there is an objective rationale, the court should look at all the circumstances present at the scene of the arrest. *See id.*[6]

---

[6] In *Terry*, the United States Supreme Court considered statistics showing the danger police officers face. 392 U.S. at 23-24 & n.21. It considered similar statistics when it held that a police officer may order the driver out of a lawfully stopped vehicle, *Pennsylvania v. Mimms*, 434 U.S. 106, 110, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977), and when it extended this rule to vehicle passengers, *Maryland v. Wilson*, 519 U.S. 408, 413, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997). We therefore find it appropriate to note that officers face serious risks not only during traffic stops/pursuits, but also in arrest situations. Between 2005 and 2014, a total of 505 officers were feloniously killed. *See 2014 Law Enforcement Officers Killed & Assaulted* tbl.21, FED. BUREAU OF INVESTIGATION, https://www.fbi.gov/about-us/cjis/ucr/leoka/2014/tables/table_21_leos_fk_circumstance_at_scene_of_incident_2005 -2014.xls [https://perma.cc/S64R-V9CE]. Of those, 95 were killed in an arrest situation and 93 were killed during a traffic pursuit/stop. *Id.* In 2014 alone, 48,315 officers were assaulted. *Id.* at tbl.74, https://www.fbi.gov/about-us/cjis/ucr/leoka/2014/tables/table_74_leos_asltd_circum_at_scene_of_incident_by_population_group_and_percent_cleared _2014.xls [https://perma.cc/X6KH-2J52]. Of those, 7,343 were assaulted while attempting other arrests and 4,022 were assaulted during a traffic pursuit/stop. *Id.* While we consider police deaths and injuries, we are also cognizant of the fact that police practices may be biased against a particular community and that "no shortage of seemingly routine

As this court discussed in *Mendez,* the objective rationale test is different from *Terry*'s reasonable suspicion of criminal activity requirement. *See id.* Officers' authority to intrude into an individual's privacy is likewise limited in scope and duration; they may control the movements of nonarrested companions only to control the scene of the arrest. To further engage in an investigatory interaction such as a pat down, officers must meet the individualized *Terry* standard of "reasonable, articulable suspicion, based on specific, objective facts, that the person seized has committed or is about to commit a crime." *Duncan,* 146 Wn.2d at 172 (emphasis omitted); *see Mendez,* 137 Wn.2d at 220; *Horrace,* 144 Wn.2d at 393. Similarly, to engage in a protective pat down, officers must be able to point to particular facts that provide "'reasonable grounds to believe the person is armed and dangerous.'" *State v. Bee Xiong,* 164 Wn.2d 506, 511, 191 P.3d 1278 (2008) (quoting *State v. Galbert,* 70 Wn. App. 721, 724-25, 855 P.2d 310 (1993)); *see also Horrace,* 144 Wn.2d at 394.[7] This, again, is a different, more individualized standard than the objective rationale test. Finally, officers may not create an exigency that would then give them reason to search or seize the companion. *Cf. Terry,* 392 U.S. at 32 (Harlan, J., concurring) ("Any person, including a policeman, is at liberty to avoid a person he considers dangerous. If and when a policeman has a

---

stops . . . end[] in physical harm or even death." Recent case, *State v. Kelly,* 95 A.3d 1081 (Conn. 2014), 128 HARV. L. REV. 1003, 1009 (2015). As noted, courts must carefully consider the circumstances of each case.

[7] Notably, the trial court relied on cases involving investigatory searches or pat downs. *See, e.g., State v. Adams,* 144 Wn. App. 100, 181 P.3d 37 (2008) (addressing a *Terry* search of a vehicle passenger). The trial court did not address the objective rationale analysis of *Mendez* and *Parker* in either its letter ruling or its CrR 3.6 order. *See* CP at 55-57, 61-62.

right instead to disarm such a person for his own protection, he must first have a right not to avoid him but to be in his presence.").

Requiring officers to articulate an objective rationale for seizing nonarrested individuals to control the scene of an arrest strikes the proper balance between safety considerations and individual privacy rights under article I, section 7. *Cf. Mendez*, 137 Wn.2d at 219. First, an officer's seizure of nonarrested companions is limited to controlling the movement of those companions only insofar as is justified to control the scene of the arrest and ensure safety. *Cf. State v. Chacon Arreola*, 176 Wn.2d 284, 294, 290 P.3d 983 (2012) ("each . . . investigative stop must be justified at its inception and must be reasonably limited in scope—based on whatever reasonable suspicions legally justified the stop in the first place"). Any intrusion into the companions' privacy is therefore "de minimis in light of the larger need to protect officers and to prevent the scene . . . from descending into a chaotic and dangerous situation for the officer, . . . nearby citizens," and those present at the scene of the arrest. *Mendez*, 137 Wn.2d at 220. Second, requiring officers to point to specific concerns at an arrest scene ensures that no person sacrifices constitutional privacy rights because of "mere proximity to others independently suspected of criminal activity." *State v. Thompson*, 93 Wn.2d 838, 841, 613 P.2d 525 (1980); *see also State v. Broadnax*, 98 Wn.2d 289, 295, 654 P.2d 96 (1982), *abrogated on other grounds by Minnesota v. Dickerson*, 508 U.S. 366, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993). Requiring an objective rationale allows the court to determine whether the detention was merely harassing or arbitrary. *See State v. Belieu*, 112 Wn.2d 587, 601-02, 773 P.2d 46 (1989).

## II. Applying the Objective Rationale Analysis, the Seizure of Flores Was Justified and the Evidence of the Gun Should Not Be Suppressed

Applying the objective rationale test, we find that McCain justifiably seized Flores to secure the scene of Powell's arrest, and that Oiumette's actions were a justified continuation of that initial seizure. We reject Flores's contention, embraced by the Court of Appeals, that the seizure must be analyzed as two events: an initial seizure by McCain, and then a *Terry* stop beginning when Oiumette called Flores back. *See* Resp't's Answer to Pet. for Review at 12; *Flores*, 188 Wn. App. at 316-17. Although a permissible contact can ripen into an impermissible seizure, *see Harrington*, 167 Wn.2d at 670 (explaining a "progressive intrusion, culminating in seizure, runs afoul of the language, purpose, and protections of article I, section 7"), we do not find that to be the case here. There was but one seizure, and both McCain and Oiumette's actions were justified by the ongoing need to control the scene of Powell's arrest.[8]

Although an anonymous tip standing alone may not be sufficient to support a *Terry* stop (a determination we need not make),[9] officers do not need to ignore

---

[8] We emphasize that courts must review an officer's actions under the totality of the circumstances to determine if a seizure is made with the authority of law and is of reasonable scope and duration. *See Mendez*, 137 Wn.2d at 221. Depending on the facts of the case, this may require an examination of the circumstances as a sequence or an examination of specific actions each officer takes. *Compare Harrington*, 167 Wn.2d 656 (holding that cumulatively police action resulted in an unlawful seizure although the initial encounter was a social contact), *with State v. Russell*, 180 Wn.2d 860, 872, 330 P.3d 151 (2014) (holding that "while the initial protective frisk was permissible, the officer violated Russell's constitutional rights when he removed a small container from his pocket and searched it without a warrant").

[9] For a thorough discussion of when an informant's tip may be the basis for a *Terry* stop, see *State v. Z.U.E.*, 183 Wn.2d 610, 352 P.3d 796 (2015). As noted, the State does not rely on the anonymous tip to justify the seizure of Powell and Flores.

information that implicates their safety when there is a lawful basis to arrest an individual. *Cf. State v. Russell*, 180 Wn.2d 860, 869, 330 P.3d 151 (2014) ("We would undermine the purposes of *Terry* and create unjustifiable risks if we hold that an officer in the field must ignore specific facts that indicate potential danger."). McCain and Oiumette could, therefore, consider the fact that there may have been a gun present when assessing what they needed to do to control the scene of Powell's arrest. Although dispatch did not indicate whether Powell was alone (the tip appears to have mentioned only Powell), when McCain arrived at the scene, Powell and Flores were walking down the street together in close proximity. CP at 59-60. McCain arrived at the scene less than five minutes after dispatch received the tip. *Id.* at 60. He was the only officer on the scene at that point. *See id.*; VRP at 72-73. McCain recognized Powell. VRP at 67-68. McCain had seen pictures of Powell or his friends holding firearms, and had information that he was at the scene of a fight in which one of his best friends was shot and killed. *Id.* at 69-70. The stop occurred after 4:30 p.m. in November. *Id.* at 66. When McCain ordered Powell to stop, both he and Flores halted, and they remained together. CP at 60. Based on these facts, McCain had an objective rationale to seize Flores to secure the scene of Powell's arrest.

Oiumette, who received the same dispatch information as McCain, arrived on the scene after Flores was put in a position of disadvantage away from Powell. *See* VRP at 86-87; CP at 60. When Oiumette arrived, McCain was calling Powell back toward him. *See* VRP at 87, 91; CP at 61. McCain's focus was on Powell. *See* VRP at 78. There is no evidence that Powell was already secured when Oiumette focused

-21-

on Flores and told him to begin walking toward Oiumette. CP at 61 ("While Officer McCain was securing Powell[,] Officer Oiumette ordered Flores to walk backwards towards him with his hands up."). Oiumette testified that he told Flores to walk back because he did not know what McCain had observed when he got there, and because he was concerned there was a firearm. *See* VRP at 88. Although Oiumette also stated, "[I]t appeared to me [Flores] was involved in [the firearm incident] somehow," *id.*, this statement alone does not turn his legitimate control of Flores's movements to secure the scene of the arrest into an investigatory stop.

While Flores was walking back toward Oiumette, he volunteered that he had a gun. CP at 61. This admission was not made in response to any questioning or prompting by Oiumette. *See id.* Once Flores volunteered that he had a gun, Oiumette had reasonable suspicion to further detain Flores and seize the gun. *See, e.g., State v. King*, 89 Wn. App. 612, 949 P.2d 856 (1998) (officer conducting a consensual search of a house could temporarily seize individual and gun for officer safety).

Officers McCain and Oiumette had an objective rationale predicated on safety concerns that justified temporarily seizing Flores to control the scene of Powell's arrest. Because Flores was not unlawfully seized, we reverse the Court of Appeals and hold that evidence of the gun should not have been suppressed.

CONCLUSION

We reverse the Court of Appeals. Flores was seized as part of the officers' attempt to control the scene of Powell's arrest. Because the officers had an objective

rationale predicated specifically on safety concerns, the seizure was lawful. The evidence of the gun should not have been suppressed.

Stephens, J

WE CONCUR:

Wiggins, J.

González, J.

Owens, J.

Fairhurst, J.

Yu, J.

No. 91986-1

GORDON McCLOUD, J. (dissenting)—"Generally, warrantless searches and seizures are unconstitutional," though there are """"a few jealously and carefully drawn exceptions."""" *State v. Gatewood*, 163 Wn.2d 534, 539, 182 P.3d 426 (2008) (quoting *State v. Ladson*, 138 Wn.2d 343, 349, 979 P.2d 833 (1999) (quoting *State v. Hendrickson*, 129 Wn.2d 61, 70, 917 P.2d 563 (1996))).

Before today, these exceptions were all based on good, previously recognized, *objective* reasons for detaining an individual. This was the case under the Fourth Amendment to the United States Constitution. *E.g.*, *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981) ("investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity"). It was also the case under article I, section 7 of the Washington State Constitution. *State v. Kennedy*, 107 Wn.2d 1, 12-13, 726 P.2d 445 (1986) (search of front seat of suspect's car was "similar to a *Terry*[1] frisk" and

---

[1] *Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

1

therefore "reasonable" under article I, section 7); *State v. Horrace*, 144 Wn.2d 386, 394, 28 P.3d 753 (2001) (embracing its search analysis as consistent with article I, section 7 protections: "to justify the intrusion of a limited pat-down search, 'the police officer must be able to point to specific facts which . . . reasonably warrant that intrusion'" (quoting *Terry*, 392 U.S. at 21)).

Even *Terry*, which recognized a new exception to the warrant requirement in 1968, required objective reasons for detaining or frisking a specific individual: *Terry* limited its new "reasonable suspicion" of criminal activity exception to situations where the officer's suspicion about an individual was objectively reasonable. 392 U.S. at 21-22 (In determining whether a search or seizure is reasonable, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?"). In Washington, we have always applied that *Terry* exception the same way; we have limited it to situations where the officer possesses objectively reasonable suspicion that the suspect has committed or is about to commit a crime. *State v. Duncan*, 146 Wn.2d 166, 172-73, 43 P.3d 513 (2002) (under Fourth Amendment and article I, section 7, a seizure requires "a reasonable, articulable

2

suspicion, based on specific, objective facts, that the person seized has committed or is about to commit a crime" (citing *Terry*, 392 U.S. at 21)).

It is therefore not surprising that our court has also limited the *Terry* exception to objectively reasonable, particularized suspicion about an individual. Our state constitution has always been interpreted to provide more protections for an individual's right to privacy, not less. *State v. Byrd*, 178 Wn.2d 611, 616, 310 P.3d 793 (2013) ("[a]rticle I, section 7 is more protective of individual privacy than the Fourth Amendment").

Today, however, the majority holds for the first time that law enforcement officers can seize an individual just like John Terry—an individual on a city sidewalk—without "individualized" suspicion and without "articulable facts" supporting individualized suspicion, based on that officer's subjective statement of purpose rather than on objectively reasonable facts. Majority at 15-17. This holding creates a new exception to the Fourth Amendment's warrant requirement, and we don't have the power to create it—only the Supreme Court does. It's also a new exception to our court's consistent statements, for decades, that article I, section 7 provides more protection for individual privacy rights than the Fourth Amendment. I therefore respectfully dissent.

3

ANALYSIS

I.    The *Terry* Exception Requires an Objective Analysis and Individualized Suspicion

In *Terry*, the United States Supreme Court created a new exception to the warrant requirement. It held that law enforcement officers may briefly stop an individual if they have "'reasonable, articulable suspicion, based on specific, objective facts, that the person seized has committed or is about to commit a crime.'" *Gatewood*, 163 Wn.2d at 539 (emphasis omitted) (quoting *Duncan*, 146 Wn.2d at 172 (citing *Terry*, 392 U.S. at 21)).

As the majority correctly explains, this court in *Mendez*[2] did adopt a rule that provides less privacy protection, but only in certain limited circumstances. Under the *Mendez* rule, police may detain an individual during a traffic stop just because he or she is present at a scene where officers have "safety concerns for [themselves], the arrestee, companions, or other citizens." Majority at 17. The *Mendez* rule relieves officers of the duty to articulate *individualized* suspicion before detaining those present at the scene of a traffic stop. It thus carves out a narrow exception to the warrant requirement. The question in this case is whether we should expand the narrow *Mendez* exception quite a bit further, to the factual situation presented in

---

[2] *State v. Mendez*, 137 Wn.2d 208, 220, 970 P.2d 722 (1999), *abrogated on other grounds by Brendlin v. California*, 551 U.S. 249, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007).

4

*Terry*—the city streets—and do so because of the officer's subjective statement of purpose for the stop rather than because of objective facts.

II.    The Majority Overturns the Most Important Prerequisites To Applying the *Terry* Exception: Objectively Reasonable Facts and Individualized Suspicion

When this court adopted the *Mendez* rule, the only United States Supreme Court cases it cited were those addressing traffic stops. *Mendez*, 137 Wn.2d at 214-21 (citing *Maryland v. Wilson*, 519 U.S. 408, 412-14, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997); *Pennsylvania v. Mimms*, 434 U.S. 106, 108-11, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977) (per curiam)). While these cases cite to some common Fourth Amendment principles,[3] their reasoning primarily reflects concerns unique to the traffic stop context. In particular, they identify two entirely car-specific reasons that officers may order drivers or passengers out of a validly stopped vehicle without meeting the *Terry* standard: (1) the order is a "'*de minimis*'" additional intrusion relative to the stop itself and (2) weapons are easily concealed in car passenger compartments. *Wilson*, 519 U.S. at 412-14 (quoting *Mimms*, 434 U.S. at 111).

---

[3] For example, the United States Supreme Court's cases on traffic stops cite the general Fourth Amendment principle that individual privacy protections must be balanced against "the public interest." *Wilson*, 519 U.S. at 413; *Mimms*, 434 U.S. at 109 (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975)).

5

The majority's decision to apply the *Mendez* rule to pedestrians ignores this reasoning and the limits it implies.[4] First, a *Terry*-like stop is far from a de minimis intrusion. *See Utah v. Strieff*, __ U.S. __, 136 S. Ct. 2056, 2070, 195 L. Ed. 2d 400 (2016) (Sotomayor, J., dissenting) ("The indignity of a stop is not limited to an officer telling you that you look like a criminal. The officer may next ask for your 'consent' to inspect your bag or purse without telling you that you can decline. See *Florida v. Bostick*, 501 U.S. 429, 438, 111 S.Ct. 2383, 115 L.Ed.2d 389 (1991). Regardless of your answer, he may order you to stand 'helpless, perhaps facing a wall with [your] hands raised.' *Terry*, 392 U.S., at 17, 88 S.Ct. 1868. If the officer thinks you may be dangerous, he may then 'frisk' you for weapons." (alteration in original) (citation omitted)). Second, weapons are less easy to conceal without a glove compartment.

The majority's decision to apply the *Mendez* rule to the *Terry* situation also ignores United States Supreme Court precedent in more relevant contexts. While

---

[4] In this way, the majority's analysis conflicts in principle with at least one previous decision. *See Duncan*, 146 Wn.2d at 173-74 (declining to extend the *Terry* stop exception to the warrant requirement beyond traffic violations to other civil infractions because "[t]raffic violations create a unique set of circumstances that may justify this extension of *Terry*, but which may not be appropriate for other civil infractions"; noting "the diminishment of privacy interests" in vehicles "'due to the law enforcement exigency created by the ready mobility of vehicles'" (quoting *State v. Johnson*, 128 Wn.2d 431, 454, 909 P.2d 293 (1996))).

that Court has never directly answered the question presented here—whether officers may detain an arrestee's companion on a public street, absent the reasonable suspicion of criminal activity required under *Terry*—it has addressed two closely related questions. In *Ybarra v. Illinois*, 444 U.S. 85, 92-94, 100 S. Ct. 338, 62 L. Ed. 2d 238 (1979), the Court held that police may not search or seize individuals merely because they are present at a public location subject to a search warrant. And in *Maryland v. Buie*, 494 U.S. 325, 334, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990), the Court held that officers conducting an in-home arrest may do a protective sweep of the home only if articulable facts suggest that other people are present and pose a safety threat. In each of these cases, the State argued just what our State argues in this case: that when officers conduct a valid search and seizure (in those cases, pursuant to a warrant), *Terry*'s standard of reasonable, articulable, and individualized suspicion should not apply to protect nearby people or places.[5] And in each of these cases, the Court rejected that argument. *Buie*, 494 U.S. at 334

---

[5] *Buie*, 494 U.S. at 330 ("[T]he State of Maryland[] argues that, under a general reasonableness balancing test, police should be permitted to conduct a protective sweep whenever they make an in-home arrest for a violent crime."); *Ybarra*, 444 U.S. at 94 ("the State contends that the *Terry* 'reasonable belief or suspicion' standard should be made applicable to aid the evidence-gathering function of the search warrant . . . to permit evidence searches of persons who, at the commencement of the search, are on 'compact' premises subject to a search warrant, at least where the police have a 'reasonable belief' that such persons 'are connected with' drug trafficking and 'may be concealing or carrying away the contraband'").

(outside arrestee's immediate grab area, Fourth Amendment protections at site of home arrest are "no more and no less than was required in *Terry*"); *Ybarra*, 444 U.S. at 94 ("the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place").

This Fourth Amendment precedent is highly relevant to the question presented here, yet neither the State nor the majority acknowledges it. By contrast, federal circuit courts have applied *Ybarra* to hold that *Terry*—requiring reasonable, articulable, and individualized suspicion—is a constitutional minimum protecting an arrestee's companion. *E.g.*, *United States v. Flett*, 806 F.2d 823, 827 (8th Cir. 1986) (applying *Terry*'s "totality of the circumstances analysis" to frisk of individual present at the scene of arrest (a private residence); rejecting a less protective standard as "in direct opposition to the Supreme Court's directions in both *Terry* and *Ybarra*"); *United States v. Bell*, 762 F.2d 495, 499 (6th Cir. 1985) (holding *Terry* standard limited frisk of individual riding in car when officers arrested driver on felony warrant (quoting *Ybarra*, 444 U.S. at 92-93)). While some federal cases have adopted the "automatic companion rule," permitting officers to frisk an arrestee's

8

companion without any particularized safety justification whatsoever,[6] these cases predate *Ybarra* and have been called into question on that basis.[7] The majority of federal cases addressing the automatic companion rule have applied the *Terry* standard instead.[8]

These cases, not cases addressing traffic stops, should guide our analysis here. The majority's contrary conclusion, that officers may detain an arrestee's companion about whom they have no individualized suspicion, conflicts in principle with *Ybarra*'s holding that the State may not justify an invasion of individual privacy on

---

[6] *E.g., United States v. Poms*, 484 F.2d 919, 922 (4th Cir. 1973) (per curiam); *United States v. Berryhill*, 445 F.2d 1189, 1192-93 (9th Cir. 1971).

[7] *See Commonwealth v. Ng*, 420 Mass. 236, 238 n.2, 649 N.E.2d 157 (1995) ("There is language in opinions of the Supreme Court . . . that casts doubt on the propriety of the bright-line *Berryhill* rule." (citing *Ybarra*, 444 U.S. at 91)); *Bell*, 762 F.2d at 498 ("We decline to adopt an 'automatic companion' rule, as we have serious reservations about the constitutionality of such a result under existing precedent.").

[8] *E.g., United States v. McKie*, 292 U.S. App. D.C. 419, 422, 951 F.2d 399 (1991) (because stop was justified by reasonable suspicion consistent with *Terry*, "[t]his [was] not . . . a 'mere propinquity' case and [court] need not take a position on the 'automatic companion' rule to decide it"); *Flett*, 806 F.2d at 827 (companion search limited by *Terry*); *Bell*, 762 F.2d at 499 (same); *United States v. Tharpe*, 536 F.2d 1098, 1101 (5th Cir. 1976) ("We need not go so far as the Ninth Circuit's rule of general justification conferring categorical reasonableness upon searches of all companions of the arrestee . . . . We simply hold that where there was good reason for an officer to apprehend that he was in a position of real danger from companions . . . that officer's pat-down search is compatible with *Terry*."), *overruled on other grounds by United States v. Causey*, 834 F.2d 1179, 1184 (5th Cir. 1987).

the basis of "a person's mere propinquity to others independently suspected of criminal activity." 444 U.S. at 91.

The majority implicitly recognizes this conflict by declining to adopt an automatic companion rule. *See* majority at 15-16 & n.5 (rejecting the State's argument that "the fact of an arrest is sufficient to satisfy *Mendez*'s objective rationale test" as "a variation of the 'automatic companion rule'"). As the majority acknowledges, such a rule would assign guilt by association. Majority at 16 n.5. Neither the state nor federal constitution permits this. *See State v. Fuentes*, 183 Wn.2d 149, 161, 352 P.3d 152 (2015) (defendant's presence at suspected drug dealer's apartment "late at night in a high-crime area" did not justify *Terry* stop); *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000) (individual's presence in high crime area is not independently sufficient to justify a *Terry* stop (citing *Brown v. Texas*, 443 U.S. 47, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979))); *Ybarra*, 444 U.S. at 94 ("The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place.").

But the majority refuses to do what other courts rejecting the automatic companion rule have done: apply the *Terry* standard. While I agree that officers

10

need not "ignore information that implicates their safety" at the scene of an arrest, majority at 20-21, I also agree with the federal courts in *Flett*, 806 F.2d at 827, and *Bell*, 762 F.2d at 499, that the *Terry* standard strikes the proper balance between safety and individual privacy at the scene of an arrest outside the car context. The standard that the majority applies instead poses significant logical and practical problems.

The source of these problems is that the majority replaces *Terry*'s (and *Ybarra*'s, and *Buie*'s) *objective* analysis with total deference to the officer's subjective belief. It does so by mischaracterizing all of our previous article I, section 7 cases as focusing on the officer's stated "purpose" for the stop (rather than on the location of the stop). Majority at 14 (contrasting what officers may do "'[f]or purposes of controlling the scene of the traffic stop'" with what they may do when "engag[ing] in . . . investigative stops" (quoting *Mendez*, 137 Wn.2d at 220)), 15 ("these cases demonstrate[ ] the standard we use to evaluate the legality of a seizure is determined by the purpose of the seizure").

But these cases never allowed exceptions to the Fourth Amendment's warrant requirement or article I, section 7's "authority of law" requirement based on the officer's subjective "purpose." Instead, they based their analysis on an objective analysis of the intrusiveness of the stop.

11

How intrusive was the stop in this case? As discussed above, it was highly intrusive—as intrusive as the stop in *Terry* itself, which led to the *Terry* prerequisites to such a stop.

The majority's footnote explaining the dangers generally faced by law enforcement does not change this. That footnote's statistics certainly show that law enforcement in general is a dangerous profession. But a *Terry* stop must by justified by objectively reasonable facts supporting *individualized* suspicion, not by generalities. *City of Indianapolis v. Edmond*, 531 U.S. 32, 37, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000) ("[a] search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing"); *State v. Jorden*, 160 Wn.2d 121, 130, 156 P.3d 893 (2007) (article I, section 7 prohibits law enforcement from checking names in motel registry for outstanding warrants absent "individualized or particularized suspicion").

III.    The State Conceded That *Terry* Was Not Satisfied

I would therefore apply *Terry*'s analysis to this stop. The trial court found the anonymous tip insufficient to justify a *Terry* stop; the State did not assign error to that finding on appeal. Pet'r's Suppl. Br. at 5 ("The State never argued this case as a valid *Terry* stop, instead arguing *Mendez/Parker*.").

12

CONCLUSION

Instead of adopting the majority's rule—which creates a new exception to the Fourth Amendment's warrant requirement and article I, section 7's privacy protections—I would follow the analysis applied in *Bell* and *Flett*. Under this analysis, officers must comply with *Terry* at the scene of an arrest. Because the State conceded in the trial court that Flores' detention did not satisfy *Terry*'s standard, I would affirm the Court of Appeals' decision to uphold dismissal. I therefore respectfully dissent.

Gordon McCloud, J.

Madsen, C.J.

14