

FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE JUL 20 2017

~Fairhurst~ CJ

CHIEF JUSTICE

This opinion was filed for record

at 8:00 am on July 20, 2017

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 93377-4 |
| Respondent, | ) | |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| WESLEY JAMES WEYAND, | ) | |
| | ) | |
| Petitioner. | ) | Filed JUL 20 2017 |

MADSEN, J.—The trial court denied Wesley Weyand's motion to suppress evidence obtained during a *Terry* stop.[1] To stop and frisk an individual, police must have reasonable, articulable suspicion that the person is engaging in criminal activity. In this case, we hold that the facts known to the police did not justify stopping Weyand and the evidence discovered during that encounter should have been suppressed. We reverse the Court of Appeals, which affirmed the trial court.

## FACTS

On December 22, 2012, at 2:40 in the morning, Corporal Bryce Henry saw a car parked near 95 Cullum Avenue, Richland, Washington, that had not been there 20

---

[1] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

minutes prior. Corporal Henry did not recognize the car and ran the license plate through an I/LEADS (Intergraph Law Enforcement Automated System) database. That license plate search revealed nothing of consequence about the vehicle or its registered owner. After parking his car, Corporal Henry saw Weyand and another male leave 95 Cullum. As the men walked quickly toward the car, they looked up and down the street. The driver looked around once more before getting into the car. Weyand got into the passenger seat. Based on these observations and Corporal Henry's knowledge of the drug history at 95 Cullum, he conducted a *Terry* stop of the car.

The history of drug activity at 95 Cullum extends back to June 2011. In June 2011, officers served a search warrant at 95 Cullum, found methamphetamine, and arrested numerous individuals for possession of a controlled substance. In January 2012, someone called the police seeking help for a resident of 95 Cullum who they reported was using methamphetamine. Also in January 2012, officers went to 95 Cullum to find a wanted subject. They found the subject, who lived at 95 Cullum at the time, and he was in possession of a controlled substance. In May 2012, an anonymous complainant reported that four to five people lived at 95 Cullum and they appeared to be using narcotics and "tweaking." In June 2012, an anonymous complainant reported that there had been a high flow of short stay foot traffic at 95 Cullum.

In June 2012, the police sent a landlord notification letter to the owner of 95 Cullum, alerting her that several of the residents had extensive criminal histories. Over the course of the following six months, police arrested those residents several times for

2

both drug- and non-drug-related offenses. In December 2012, police arrested two subjects for drug offenses. Neither of them were 95 Cullum residents, but both had been at 95 Cullum prior to their arrests. Finally, on December 18, 2012 (four days before Weyand's arrest), police executed a search warrant at 95 Cullum. During that search, police found methamphetamine and drug paraphernalia, and police arrested several people for both drug- and non-drug-related offenses. Because of this history of drug use and possession, Corporal Henry identified 95 Cullum as a "known drug location." Tr. (Suppression Hr'g) at 6.[2]

After stopping Weyand, Corporal Henry observed that Weyand's eyes were red and glassy and his pupils were constricted. Corporal Henry is a drug recognition expert and believed that Weyand was under the influence of a narcotic. When Corporal Henry ran Weyand's name, he discovered an outstanding warrant and arrested Weyand. Corporal Henry searched Weyand incident to that arrest and found a capped syringe. Corporal Henry advised Weyand of his *Miranda*[3] rights, and Weyand admitted that the substance in the syringe was heroin that he had bought from a resident inside 95 Cullum.

The State charged Weyand with one count of unlawful possession of a controlled substance. Clerk's Papers at 1; RCW 69.50.4013(1). Weyand moved to suppress all evidence and statements under Criminal Rules (CrR) 3.5 and 3.6 and to dismiss the case

---

[2] As Weyand noted below, there is nothing in the record other than Corporal Henry's statement to show that the Richland Police Department had designated 95 Cullum as a "known drug house." *See* Tr. (Suppression Hr'g) at 32. The trial court's findings of fact do not include a finding that 95 Cullum is a "known drug house." Rather, the trial court found that there is "extensive documented narcotic activity associated with 95 Cullum." Clerk's Papers at 69.

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

against him. Weyand argued that the officer did not have sufficient individualized suspicion to conduct the investigatory stop.

After the hearing, the court concluded that the seizure was a lawful investigative stop. According to the court, Corporal Henry had reasonable suspicion to believe that Weyand was involved in criminal activity. The court found Weyand's case distinct from *State v. Doughty*, 170 Wn.2d 57, 239 P.3d 573 (2010), because in this case there was actual evidence of drug activity at, as well as known drug users frequenting, 95 Cullum. The court additionally found that Weyand knowingly, intelligently, and voluntarily waived his *Miranda* rights; thus, all post-*Miranda* statements were admissible at trial. Weyand waived his right to a jury trial and agreed to submit the case to a stipulated facts trial. Finding that Weyand possessed a loaded syringe that contained heroin, the court found Weyand guilty of unlawful possession of a controlled substance.

Weyand appealed, and the Court of Appeals affirmed the conviction. Initially, the court rejected the trial court's attempt to distinguish *Doughty* on the basis that 95 Cullum was a known drug house. *State v. Weyand*, No. 31868-1-III, slip op. at 12-13 (Wash. Ct. App. Jan. 27, 2015) (unpublished) (*Weyand* I), http://www.courts.wa.gov/opinions/pdf/318681.unp.pdf. The Court of Appeals reasoned, "[L]aw enforcement must observe more than the accused exiting a known drug home at night to justify a *Terry* stop." *Id.* at 14. The "more" in this case, the court said, was Corporal Henry observing Weyand walking quickly from the home and looking up and down the street. *Id.* The Court of Appeals concluded that the State "presented the

slimmest of evidence needed to justify the stop of Wesley Weyand." *Id.* at 18. The totality of the circumstances, coupled with the officer's training and experience, showed that the officer had a reasonable, articulable suspicion that justified the stop. *Id.* at 19. Those circumstances included "the long history of drug activity at 95 Cullum, the time of night, the 20 minute stop at the house, the brisk walking, and the glances up and down the street." *Id.*

Weyand petitioned this court for review, which we granted and remanded to the Court of Appeals for reconsideration in light of *State v. Fuentes*, 183 Wn.2d 149, 352 P.3d 152 (2015).[4] *State v. Weyand*, 184 Wn.2d 1001, 357 P.3d 663 (2015). In *Weyand* II, the Court of Appeals again affirmed Weyand's conviction. *State v. Weyand*, No. 31868-1-III, slip. op. at 1-3 (Wash. Ct. App. June 7, 2016) (unpublished) (*Weyand* II), http://www.courts.wa.gov/opinions/pdf/318681.pdf. In the second opinion, the Court of Appeals emphasized the extensive drug activity at 95 Cullum, Corporal Henry's training and experience, and Weyand walking quickly while glancing around and found Weyand's case closer to *Fuentes* than *Sandoz*. Weyand again petitioned this court for review.

## ANALYSIS

When we review the denial of a motion to suppress, we review the trial court's conclusions of law de novo and the findings of fact used to support those conclusions for substantial evidence. *Fuentes*, 183 Wn.2d at 157 (citing *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009)).

---

[4] *Fuentes* was consolidated with *State v. Sandoz*.

Under the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution, an officer generally may not seize a person without a warrant. *Id.* at 157-58 (citing *Garvin*, 166 Wn.2d at 248). There are, however, a few carefully drawn exceptions to the warrant requirement. *Id.* at 158. The State bears the burden to show that a warrantless search or seizure falls into one of the narrowly drawn exceptions. *Garvin*, 166 Wn.2d at 250. One of these exceptions is the *Terry* investigative stop. *Fuentes*, 183 Wn.2d at 158 (citing *State v. Day*, 161 Wn.2d 889, 895, 168 P.3d 1265 (2007)); *see also Terry*, 392 U.S. 1. The *Terry* exception allows an officer to briefly detain a person for questioning, without a warrant, if the officer has reasonable suspicion that the person is or is about to be engaged in criminal activity. *Fuentes*, 183 Wn.2d at 158. An officer may also briefly frisk the person if the officer has reasonable safety concerns to justify the protective frisk. *Id.*

To conduct a valid *Terry* stop, an officer must have "reasonable suspicion of criminal activity based on specific and articulable facts known to the officer at the inception of the stop." *Id.* (citing *State v. Gatewood*, 163 Wn.2d 534, 539-40, 182 P.3d 426 (2008); *State v. Glover*, 116 Wn.2d 509, 513-14, 806 P.2d 760 (1991) (plurality opinion)). To evaluate the reasonableness of the officer's suspicion, we look at the totality of the circumstances known to the officer. *Id.* (citing *Glover*, 116 Wn.2d at 514). "The totality of circumstances includes the officer's training and experience, the location of the stop, the conduct of the person detained, the purpose of the stop, and the amount of physical intrusion on the suspect's liberty." *Id.* (citing *State v. Acrey*, 148 Wn.2d 738,

746-47, 64 P.3d 594 (2003)). The suspicion must be individualized to the person being stopped. *Id.* at 159 (citing *State v. Thompson*, 93 Wn.2d 838, 841, 613 P.2d 525 (1980)).

The Court of Appeals recognized that Weyand's late night, short stay visit to 95 Cullum did not justify the stop in this case. However, the court reasoned that "something more"—Weyand's glances up and down the street—provided reasonable suspicion of criminal activity. We disagree. The question we must answer here is not whether the State offered something "more" than the extensive drug history at 95 Cullum and a 20 minute stay at 95 Cullum at 2:40 in the morning to justify Weyand's seizure. Rather, the question is whether the specific facts that led to the stop would lead an objective person to form a reasonable suspicion that Weyand was engaged in criminal activity. In evaluating the facts known at the inception of the stop, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry*, 392 U.S. at 21-22 (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S. Ct. 280, 69 L. Ed. 543 (1925)). "While we evaluate the totality of the circumstances to determine whether a reasonable suspicion of criminal activity exists, we do so, in part, by examining each fact identified by the officer as contributing to that suspicion." *Fuentes*, 183 Wn.2d at 159.

This court recently examined the requirements for a *Terry* stop in *Fuentes*, which involved two consolidated cases, *Sandoz* and *Fuentes*. In *Sandoz*, the officer had been patrolling an apartment complex that had a high number of documented crimes, including

drug crimes. 183 Wn.2d at 153. While on patrol, an officer familiar with the complex saw a car that did not belong to any of the tenants. *Id.* As the officer spoke to the driver of that car, Sandoz left the apartment of a woman who the officer knew had a conviction for possession of narcotics with intent to distribute. *Id.* at 154. When Sandoz saw the officer, his eyes got big, he was visibly shaking, and his face looked pale and thin. *Id.*

The officer stopped Sandoz, who then told the officer that he was there to collect $20 from the woman who lived in the apartment. *Id.* After further conversation, Sandoz admitted that he had a drug problem and had a crack pipe in his pocket. *Id.* The officer arrested Sandoz and found cocaine during a search incident to that arrest. *Id.* at 154-55. The trial court held the officer had specific and articulable facts to support the *Terry* stop. *Id.* at 155. We disagreed, concluding that visiting an apartment of a woman known to have a conviction for possession with intent to distribute and observing Sandoz's pale, thin face, visible shaking, and "big" eyes did not give the officer reasonable suspicion that Sandoz was engaged in criminal activity. *Id.* at 164.

In *Fuentes*, officers were surveilling an apartment where they suspected the resident had been selling narcotics. *Id.* at 156. Eleven months before, officers had executed a search warrant on the apartment, where they found methamphetamine and related materials. *Id.* Subsequent interviews with people arrested for drug offenses led police to suspect the resident had begun selling narcotics again. *Id.* On the night of the arrest, police surveilling the apartment saw 10 people enter and leave the apartment within 2 hours, each staying inside for between 5 and 20 minutes. *Id.* The officers

8

testified that this behavior indicated narcotic activity was taking place in the residence. *Id.* Around midnight, officers saw Fuentes park her car outside the apartment, enter the apartment, stay about 5 minutes, and return to her car. *Id.* Fuentes then removed a plastic bag from her trunk, reentered the apartment, stayed for 5 minutes, and returned to her car with a bag that had noticeably less content in it than before. *Id.* at 156-57. Based on those observations, officers conducted a *Terry* stop. *Id.* at 157. After waiving her *Miranda* rights, Fuentes told police that she had delivered marijuana to the apartment. *Id.* The trial court found that reasonable suspicion justified the stop. Based on the totality of the circumstances and the inferences therefrom, we agreed that the officers had reasonable suspicion to believe criminal activity was currently taking place and that Fuentes was involved in that activity. We concluded the facts warranted the investigatory stop sanctioned by *Terry*. *Id.* at 157, 164.

In this case, we find that the totality of the circumstances did not justify a warrantless seizure. Our recent cases are helpful in reaching this conclusion, but we emphasize that when evaluating the justification for a *Terry* stop, each case must be evaluated on its own facts.

Here, the trial court's decision rested primarily on evidence that 95 Cullum was a "known drug location." However, Corporal Henry did not observe current activity that would lead a reasonable observer to believe that criminal activity was taking place or about to take place in the residence. In *Sandoz*, we noted that merely visiting an apartment belonging to a person who had a prior conviction for possession with intent to

9

deliver with no indication of present criminal activity at the apartment did not warrant an intrusion into Sandoz's private affairs. In this case, it is also notable that police identified 95 Cullum as a known drug location because of the residents' histories of drug possession and use, not for a history of selling or distributing.

In affirming Weyand's conviction, the Court of Appeals reasoned that this case is "closer" to *Fuentes* than *Sandoz*. We disagree. In *Fuentes*, the officers were conducting a drug surveillance operation at the "known" drug house and observed 10 short stay visits during the two hour period prior to the stop. The reasonable inference was that criminal drug activity was presently taking place at the residence. When viewed in light of the activities taking place, Fuentes's conduct raised a reasonable suspicion that she was involved in that activity.

The remaining evidence supporting the court's decision here was Corporal Henry's belief that Weyand was acting suspiciously by walking quickly to his car and looking up and down the street. In the trial court and before the Court of Appeals, Weyand relied on *Doughty* to argue that the officer did not have reasonable suspicion justifying the *Terry* stop. In *Doughty*, we noted that there was no informant tip as in *State v. Kennedy*, 107 Wn.2d 1, 726 P.2d 445 (1986), or "furtive movement." 170 Wn.2d at 64. In this case, the Court of Appeals distinguished *Doughty*, apparently concluding that walking quickly while looking up and down the street was a furtive movement. But one could conclude that looking around at 2:40 in the morning is an innocuous act, which

cannot justify an intrusion into a person's private affairs.[5] At most, Weyand's actions were equivocal.

Reliance on "furtive movements" as the basis for a *Terry* stop can be problematic. Case law has not precisely defined such movements, and courts too often accept the label without questioning the breadth of the term. Other courts and legal scholarship have become increasingly critical of relying on furtive movements as a basis for a *Terry* stop. As one judge explained, "These descriptions do not constitute articulable reasonable suspicion that criminal activity is afoot. Rather, they are vague generalizations of what might be perceived as suspicious activity—which does not provide a legal (or factual) basis for a *Terry* stop." Shira A. Scheindlin, *The Impact of Race and Policing—Past, Present, and Future*, 25 NAT'L BLACK L.J. 1, 13 (2016).[6] Judge Richard Posner has

---

[5] *See State v. Armenta*, 134 Wn.2d 1, 13, 948 P.2d 1280 (1997) (large sums of cash in suspect's pocket was innocuous fact) (citing *State v. Tijerina*, 61 Wn. App. 626, 629, 811 P.2d 241 (1991) (presence of soap in the car was innocuous fact)); *State v. Moreno*, 173 Wn. App. 479, 491, 294 P.3d 812 (2013) (suspect's location, driving speed, and passenger's shirt were innocuous facts insufficient to justify the stop); *State v. Santacruz*, 132 Wn. App. 615, 618, 133 P.3d 484 (2006) (dilated pupils alone was innocuous fact); *cf. State v. Samsel*, 39 Wn. App. 564, 570, 694 P.2d 670 (1985) ("circumstances which appear innocuous to the average person may appear incriminating to a police officer in light of past experience"). In its first opinion, the Court of Appeals too struggled with the line between suspicious and innocuous facts, and the opinion cautioned against courts giving too much deference to law enforcement experience—even as it grounded its decision on Corporal Henry's conclusion that Weyand looking up and down the street was suspicious. The court wrote, "The officer's transmutation of innocuous facts into incriminating facts by his experience may be a practice that engenders difficulty for a court to determine if the officer articulates objective facts warranting reasonable suspicion." *Weyand* I, slip op. at 19.

[6] Notably, Judge Scheindlin authored the opinion in *Floyd v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013), which held the New York City Police Department's stop and frisk policy unconstitutional. This article is based, in part, on the empirical studies conducted for that case. That data showed that from 2004 to 2009, the two boxes that officers checked most frequently indicating the reasons for a stop were those for furtive movements (42 percent of forms) and high crime area (55 percent of forms). In 2009, furtive movement was a basis for the stop nearly 60

11

similarly recognized that "furtive movements," standing alone, are a vague and unreliable indicator of criminality, writing, "Whether you stand still or move, drive above, below, or at the speed limit, you will be described by the police as acting suspiciously should they wish to stop or arrest you. Such subjective, promiscuous appeals to an ineffable intuition should not be credited." *United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005). It is important to recognize that a *Terry* stop is a seizure and constitutes a limited exception to the warrant requirement. Whether the facts in a given case justify an investigatory stop must be evaluated against the right to be free from intrusion into that person's private affairs. Simply labeling a suspect's action a "furtive movement," without explaining how it gives rise to a reasonable and articulable suspicion, is not sufficient to justify a *Terry* stop.

Reasonable suspicion must be *individualized* to the person being stopped. *Fuentes*, 183 Wn.2d at 159. As explained above, Corporal Henry identified 95 Cullum as a "known" drug house based on the history of police contacts, but he failed to articulate a reasonable suspicion that Weyand was involved in criminal activity at that house based on Weyand's conduct at the time of the stop. Police cannot justify a suspicion of criminal conduct based only on a person's location in a high crime area. As we have said before:

---

percent of the time. Yet, both furtive movements and high crime area turned out to be weak indicators of criminal activity. From 2004 to 2009, stops were 22 percent more likely to result in arrest if the officer had *not* checked high crime area and 18 percent more likely if the officer had not checked furtive movements. *Id.* at 574-75. The study also showed that racial bias played a role in whether an officer deemed a suspect's movement to be furtive; the officers indicated furtive movements in 48 percent of the stops of African-Americans, 45 percent of the stops of Latinos, but only 40 percent of the stops of Caucasians. *Id.* at 580-81.

12

> It is beyond dispute that many members of our society live, work, and spend their waking hours in high crime areas, a description that can be applied to parts of many of our cities. That does not automatically make those individuals proper subjects for criminal investigation.

*State v. Larson*, 93 Wn.2d 638, 645, 611 P.2d 771 (1980). Just as many members of our society live, work, and spend their days in high crime areas, many members of our society interact with people who have been previously convicted of crimes. The previous convictions of friends, family members, and associates alone does not give rise to a reasonable, articulable suspicion necessary to justify a stop and frisk.

Having found that Corporal Henry lacked reasonable suspicion to stop Weyand, we reverse.

## CONCLUSION

We reverse the Court of Appeals and hold that walking quickly and looking around, even after leaving a house with extensive drug history at 2:40 in the morning, is not enough to create a reasonable, articulable suspicion of criminal activity justifying a *Terry* stop.

No. 93377-4

_Madsen, J._

WE CONCUR:

_Fairhurst, C.J._

_Johnson, J._

_Stephens, J._

_Owens, J._

_Wiggins, J._

_Gordon McCloud, J._

14

No. 93377-4

GONZÁLEZ, J. (concurring)—The police officer did not have the individualized suspicion necessary to stop Wesley Weyand. Our state constitution guarantees, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." WASH. CONST. art I, § 7. This generally means that "[each] person has the right to be left alone by police" absent probable cause he or she has engaged in criminal activity. *State v. Grande*, 164 Wn.2d 135, 141, 187 P.3d 248 (2008). An investigatory stop (*Terry* stop)[1] is the narrow exception to that rule. *State v. Garvin*, 166 Wn.2d 242, 249-50, 207 P.3d 1266 (2009).

In determining if a *Terry* stop is justified, courts must weigh the totality of the circumstances. *United States v. Cortez*, 449 U.S. 411, 417-18, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981) (citing *Brown v. Texas*, 443 U.S. 47, 51, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979)). Specifically, before performing a stop, an officer must have an "individualized, reasonable, articulable suspicion" that there "is a

---

[1] I refer to these investigatory stops as *Terry* stops. They receive this name from the landmark case *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

substantial possibility" the person being stopped is connected to a crime. *State v. Flores*, 186 Wn.2d 506, 520, 379 P.3d 104 (2016); *State v. Kennedy*, 107 Wn.2d 1, 6, 726 P.2d 445 (1986). The individualized suspicion must be the officer's "actual, conscious, and independent cause" to stop the person. *State v. Chacon Arreola*, 176 Wn.2d 284, 299-300, 290 P.3d 983 (2012). The individualized suspicion requirement limits an officer's ability to act on impermissible inferences. This requirement is rooted in our constitution, which demands clear standards that protect privacy and prevent pretextual stops. WASH. CONST. art. I, § 7. "Unless there is specific evidence pinpointing the crime on a person, that person has a right to their own privacy and constitutional protection against police searches and seizures." *Grande*, 164 Wn.2d at 145-46.

I agree with the majority that the "[p]olice cannot justify a suspicion of criminal conduct based only on a person's location in a high crime area." Majority at 12. Our constitution requires *individualized* suspicion of criminal activity. It guarantees individuals equal privacy protections no matter their cultural backgrounds or economic circumstances. Presence in a neighborhood with a poor reputation does not diminish a person's expectation of privacy, and guilt by association is not an acceptable way to establish an individualized suspicion. *See, e.g.*, *Flores*, 186 Wn.2d at 522 & n.5 (rejecting "automatic companion rule").

Proximity to criminal activity is not a waiver of one's privacy protections. On these governing principles, this court is unanimous.

I write separately because the majority clings to *State v. Fuentes*, 183 Wn.2d 149, 352 P.3d 152 (2015), even though *Fuentes* condoned police practices of making warrantless stops in "bad" neighborhoods. *See id.* at 164-65 (González, J., dissenting in part). *State v. Fuentes* was consolidated with *State v. Sandoz* because they share a similar set of facts. In both cases, an individual's visit to a building in a "high crime area" was the foundation for a *Terry* stop. Yet, the cases resulted in incongruous holdings. In *Sandoz*, we unanimously held that the *Terry* stop was unreasonable because insufficient facts gave rise to an individualized suspicion. In *Fuentes*, conversely, a divided court incorrectly found that the officer's suspicion of Marisa Fuentes was based on something criminal she had done. *Id.* at 163-64. But the only detail distinguishing *Fuentes* from *Sandoz* was an officer's observation of Fuentes carrying a filled bag into the house and leaving shortly thereafter. *Id.* The court focused on the diminished size of the bag, and this fact alone was sufficient for *Fuentes*'s bare majority to find individualized suspicion for a *Terry* stop after officers followed her all the way home. *See id.* at 167 (González, J., dissenting in part) ("the judge noted specifically that she was not stopped for a traffic infraction"). Carrying a bag with something inside it, however, does not make someone more or less suspicious. It no more represents

3

drug delivery than driving a car, talking on a cell phone, or standing on a street corner. Under *Fuentes*, being in a "bad" neighborhood with drug houses and loitering or talking on a cellphone would be sufficient to support a *Terry* stop. This cannot be the "authority of law" our constitution demands before a person's privacy interests can be invaded. WASH. CONST. art. I, § 7.[2]

The majority seems to agree that this cannot be the constitutional standard. Otherwise, it would have found sufficient individualized suspicion in this case. Police officers stopped Weyand after seeing him leave a house with known drug activity and look up and down the street before entering his car. Clerk's Papers at 68-73 (listing "extensive documented narcotic activity associated with 95 Cullum"). The officer explained he "[s]pecifically" suspected Weyand was in possession of a controlled substance "based on the time of the night[,] the . . . short stay of [his] vehicle, the suspicious manner in which the males were acting, going to the car as if they were checking the area, [and the officer's] personal experience with that house." Tr. (Suppression Hr'g) at 8-9. The majority agrees Weyand's entry into the drug house coupled with his innocuous, innocent activity was

---

[2] Express considerations of privacy were conspicuously absent in *Fuentes*. Fortunately for Weyand, the majority has taken his privacy interests into account. In this way, the majority appears to at least limit *Fuentes* to its facts. Still, *Fuentes*'s lingering impact is uncertain because the majority interprets it to mean an individualized suspicion can be established when there is a "reasonable inference . . . that criminal drug activity [is] presently taking place." Majority at 10.

insufficient individualized suspicion. Majority at 12. But the majority also upholds *Fuentes*. Unlike the majority, I find no meaningful way to distinguish the facts in *Fuentes* from the facts in this case. The Court of Appeals' decision in this case indeed proves continued reliance on *Fuentes* is problematic. *Fuentes* forced the Court of Appeals into the undesirable position of determining if "[seeing] the suspect enter and exit a house" with "extensive drug activity" "conforms closer to" *Fuentes* or *Sandoz* even though those cases are essentially indistinguishable. *State v. Weyand*, No. 31868-1-III, slip. op. at 2-3 (Wash. Ct. App. June 7, 2016) (unpublished), http://www.courts.wa.gov/opinions/pdf/318681.unp.pdf.

Precedent deserves great respect, but "[w]hen the generalization underpinning a decision is unfounded, we should not continue in blind adherence to its faulty assumption." *Rose v. Anderson Hay & Grain Co.*, 184 Wn.2d 268, 282, 358 P.3d 1139 (2015) (citing *Arizona v. Gant*, 556 U.S. 332, 351, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009)). We should expressly overrule *Fuentes* and disapprove of any rule that gives power to pretext and profiling. *Fuentes* "is so problematic that it *must* be rejected." *State v. Otton*, 185 Wn.2d 673, 678, 374 P.3d 1108 (2016). Until we stop upholding the incongruity between *Sandoz* and *Fuentes*, *Fuentes* will continue to be a source of confusion and harm.

The importance of context for establishing a totality of the circumstances should not be understated, but there still needs to be individualized suspicion of

5

criminal activity to justify a *Terry* intrusion. To hold otherwise would mean giving unquestioning deference to police hunches regarding innocuous facts, thereby granting officers unfettered authority to stop anyone based on the officers' personal biases.[3] Like a person's skin color, generalized notions stemming from a person's innocuous conduct and setting are not a substitute for an individualized suspicion. Thus, while an officer may rely on his or her training and knowledge of a particular location and "need not rule out the possibility of innocent conduct," *United States. v. Arvizu*, 534 U.S. 266, 277, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002), the officer must have "actual, conscious, and independent cause" based on particularized facts that the person is engaging in criminal activity before the officer can stop the person. *Arreola*, 176 Wn.2d at 299-300.

This court got it right in *Sandoz* when we held entry into a known drug house is not enough to establish individualized suspicion to support a *Terry* stop. Unlike the majority, majority at 9-10, I believe this holds true, even if other drug transactions occurred at the location previously.[4] The majority's artificial

---

[3] *See also* Angela J. Davis, *Prosecution and Race: The Power and Privilege of Discretion*, 67 FORDHAM L. REV. 13, 27 (1998) ("The practical effect of this deference [to discretion] is the assimilation of police officers' subjective beliefs, biases, hunches, and prejudices into law."); *State v. Barber*, 118 Wn.2d 335, 350-51, 823 P.2d 1068 (1992) (Dolliver, J., dissenting) ("Everything that happened and everything Officer Hershey saw after he initially decided three black men walking in Bellevue must be up to no good is tainted by that decision, and this court should say so.").

[4] *See* David A. Harris, *The Stories, the Statistics, and the Law: Why "Driving While Black" Matters*, 84 MINN. L. REV. 265, 294-97 (1999) (describing "rational discrimination" in the context of drug offenses and why "arrest data for drug crimes is highly suspect").

distinction between drug sales and drug use is not helpful. Proximity to criminal activity, regardless of its nature, does not support an individualized suspicion. And creating an exception for innocuous conduct, such as carrying a bag, allows officers to justify a stop based on criminal profiling. *Fuentes* is incorrect and harmful.

Because the majority wedges *Weyand* between *Fuentes* and *Sandoz* rather than overruling *Fuentes*, I concur in result.